# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2094

_____

United States of America,             *
                                     *
        Plaintiff – Appellee,      *
                                     *  Appeal from the United States
     v.                           *  District Court for the
                                     *  District of South Dakota.
Joel Alvin Johnson, Jr.,        *
                                     *
        Defendant – Appellant.   *

_____

Submitted: December 11, 2007
Filed: March 26, 2008

_____

Before BYE, JOHN R. GIBSON, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Joel Alvin Johnson, Jr. was indicted with five counts of aggravated sexual abuse of a child. See 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(B). Johnson pled not guilty to all charges, and the case proceeded to trial. At the conclusion of the government's case, Johnson moved for a judgment of acquittal. The district court[1] dismissed three counts. A jury returned a verdict convicting him of one of the remaining two counts. The district court sentenced Johnson to 152 months of imprisonment. Johnson appeals, arguing that the evidence was insufficient and that the district court

_____

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

improperly allowed the government to ask leading questions of a child witness. We affirm.

## I.

Johnson was accused of sexually abusing two sisters, A.S. and H.S. The sisters lived with Lori Eagle in Lower Brule, South Dakota, for over two years while their parents were in prison. The girls were both under the age of four when they went to stay with Eagle. Johnson helped care for the girls during that time. The girls' family became concerned for their welfare after H.S. told her mother about problems at Eagle's house. The girls' grandmother removed them from Eagle's care and took temporary custody over them. After the girls' mother was released from prison, the girls lived with her. That is when they told her that Johnson sexually abused them while they were living with Eagle.

Johnson was indicted on five counts of sexual abuse of a child: Count I: sexual abuse of A.S. by penetration of her genital opening with his finger; Count II: sexual abuse of A.S. by penetration of her anus with his finger; Count III: sexual abuse of A.S. by contact between his penis and her vulva; Count IV: sexual abuse of H.S. by the intentional touching not through the clothes of his penis with her hand; Count V: sexual abuse of H.S. by contact between his penis and her mouth. The case proceeded to a jury trial.

A.S. was the first sister to testify. At the time of trial, A.S. was nine years old. She affirmed that she was touched in a way that made her upset, scared, or hurt multiple times while living at Eagle's house. On the first occasion, A.S. testified that she was playing with toys in her bedroom when Johnson entered the room. She stated that his hands touched her bottom, and she felt scared. His hands did not go inside her clothing. The government asked A.S. if she remembered other parts of the body that Johnson touched, if Johnson had talked about touching her body, or if she saw

Johnson without his clothes. She responded no to each question. The government then inquired whether A.S. told someone about her "front part" being touched. A.S. responded affirmatively. The government asked whether a person really did touch her front part. A.S. said yes, but she did not remember who it was. The government asked A.S. to circle the part of her body that was touched. A.S. could not remember where the touching took place. She denied seeing "a part of his body that would be . . . called a private part." She also denied that any part of the person's body went inside her body.

The government asked A.S. if she was ever told to keep certain secrets. A.S. replied, "To not tell anybody what happened." The government inquired whether Johnson told her that, and A.S. said yes. She described Johnson saying it "[i]n a mean way," and she understood it to be a threat. The government asked A.S. how it made her feel, but A.S. did not answer. The district court then excused the witness and stated that "[t]he record should reflect that the last witness was sobbing and had her head on her grandmother's shoulder."

H.S. then took the witness stand. She was seven years old. The government asked H.S. if she knew what telling the truth was. H.S. responded affirmatively. H.S. denied that anyone visited Eagle's house and helped take care of H.S. The government then asked if H.S. knew Johnson, and she said yes. She said that Johnson did not help take care of any kids at Eagle's house. The government then inquired, "Did there ever come a time when anybody touched you or your body in any way that made you sad or made you cry or made you upset?" H.S. responded negatively at first. Then she said that "[t]he thing that I remember—that I remember very, very well is when [Eagle] threw me against the wall." H.S. first told her mother, who was still in jail at the time, about the incident.

The government next focused on Johnson. The government asked H.S. to point to him, and she did. The government asked if she liked Johnson. H.S. said no,

"because he did mean stuff that he wasn't supposed to do to us." H.S testified that "[Johnson] said if I don't do something—something back to him, then he'll—if he sees us again, he'll kill us." The government asked H.S. if she was scared of Johnson, and H.S. said yes. H.S. admitted that Johnson told her to keep a secret but that she had not kept it. She confirmed that she was afraid to tell the secret to the court. H.S. did not respond to the government's subsequent questions.

The government later asked if H.S.'s grandmother came to Eagle's house to see the girls. H.S. said yes but that she did not visit with her grandmother "[b]ecause [Eagle] always used to hide us in the basement and say that we were sleeping and stuff." The government questioned whether H.S. ever yelled so that her grandmother would hear her, and H.S. said no. The government asked if it was because she was scared, and H.S. said yes.

The government brought up the issue of telling the truth again and emphasized that the jury did not know what happened to H.S. The government spoke of "the secrets that happened to you at Lori Eagle's." The government asked if any part of Johnson's body touched a part of H.S.'s body. She said his hands. She denied that he had her touch a part of his body. She also denied that any part of his body went inside any part of her body.

Next, on cross-examination, defense counsel asked, "[I]t's safe to say that you were so little you really don't remember a whole lot that happened there, do you?" H.S. said yes. Counsel asked, "You really don't remember anything involving [Johnson] touching you, do you?" H.S. said no. Counsel then asked, "And, in fact, you've had a lot of people talk about that subject with you, haven't you?" H.S. said yes. Counsel finally asked, "So if you were sitting here today, you really couldn't tell us if anything happened to you with [Johnson], could you, because you really don't remember it; right?" Again, H.S. said yes. Counsel confirmed that by saying yes, she agreed with counsel.

On redirect examination, the government asked H.S. questions emphasizing that Johnson had told her to keep a secret. The government asked what would happen if she told a secret. H.S. replied, "If he seen us again, he'll kill us." The government asked H.S. a few times if she remembered what Johnson did right before he threatened her. H.S. said yes each time. The government then asked if "you just don't want to talk about it because you don't like it," and H.S. said yes.

The government asked H.S. what Johnson did. She responded, "Bad stuff to me." The government asked if the bad stuff was the touching of her body, and she responded affirmatively. The government inquired if H.S. had to touch Johnson's body. H.S. testified: "He pulled this arm down like that with his arm (indicating). Then he grabbed my other arm, this arm, and made me do something back to him (indicating)." The government asked the location on Johnson's body of where she did "something back to him," and H.S. circled the genital area on an anatomically correct diagram. H.S. said that when she touched that body part, Johnson's clothes were on, and she could not see the body part. The government asked if Johnson pulled her hand or arm "over there to that place." H.S. nodded. H.S. stated "that's when he told me if I—I had to keep this a secret. If I don't, if I tell anybody, then if he sees me and my sister ever again, then he'll kill us."

The government followed up by asking, "He put that body part in another part of your body too, didn't he?" H.S. said yes. Defense counsel objected to the leading question. The district court overruled the objection because the witness was having problems. The government asked where Johnson put his body part and whether she knew the other place. H.S. shook her head and said she could not remember. The government then offered, "Do you remember saying that he put it in your mouth?" H.S. nodded. The government continued: "And he did, didn't he?" Again H.S. nodded. The government asked if it hurt her and if she liked it, and H.S. shook her head to both questions. The government asked if she told Johnson not to do it, and

H.S. nodded.  H.S. stated she kept the secret until she told her mother after she had been removed from Eagle's house.

On recross-examination, defense counsel asked H.S. if she was currently confused, and H.S. said yes.  Defense counsel inquired whether "you've had a lot of help with people telling you what you need to do here today" and "[p]eople telling you that maybe you should say this or that."  H.S. said yes to both inquiries.  After prompting from counsel, H.S. admitted that earlier she told counsel that she did not remember anything.  Counsel asked how old H.S. was when she left Eagle's house, and H.S. said five years old.  H.S. admitted that she had a hard time remembering this "stuff" and had talked to a lot of people, including A.S.  Twice more, counsel questioned H.S. whether she really remembered what happened, and both times H.S. agreed with counsel that she did not.

On redirect examination, the government asked H.S. whether Johnson told her to keep the secret, whether she told the court the secret, and whether it really happened.  H.S. said yes to each question.  The government broached the topic of telling the truth versus telling a lie, and H.S. confirmed she was telling the truth.

The government next re-called A.S. to the witness stand.  The government asked what the secret was that Johnson told A.S. to keep.  A.S. replied, "What he did to me and [H.S.]"  She explained that Johnson did "[b]ad things" to her.  But when prompted what the bad things were, A.S. said she did not know, even though she admitted telling people about those same things.  She then said she did not remember telling them.  The government asked her if she simply did not want to talk about it, and she said yeah.  The government encouraged her to tell the jury who had not heard about the bad things, and A.S. nodded her head.  But she then answered the government's subsequent questions with "I don't know" and "I don't want to tell."  The government asked if A.S. was afraid of somebody there, and A.S. nodded.  The

-6-

district court interjected that it did not think A.S. could testify, and defense counsel declined cross-examination.

The government then called Dr. Edward Mailloux to testify about child sexual abuse. He was a pediatrician and the Medical Director at Child's Voice—a child abuse evaluation center—in Sioux Falls, South Dakota. Dr. Mailloux emphasized that it is extremely difficult for children to talk about sexual abuse because they think they are in trouble, they are fearful, and they do not understand what happened. For that reason, they often delay reporting abuse. But he testified that children have the ability to remember traumatic events that happened when they were young—such as three years old. Finally, he noted that although children are easily confused about sexual abuse, they do not commonly lie about abuse.

The government next called Special Agent Kenser of the Federal Bureau of Investigation. Agent Kenser interviewed Johnson about the sexual abuse allegations by A.S. Agent Kenser said that Johnson's initial response was denial and described Johnson as looking "agitated somewhat." Johnson exercised his right to leave the interview room but returned to the room ten minutes later. Agent Kenser stated Johnson "appeared remorseful and attempting to cooperate." Johnson repeatedly stated that he was "so stupid" and an "idiot." Johnson then explained that he gave a bath to A.S. and H.S. As he was drying A.S., she jumped up and down and gyrated on his hand. Agent Kenser testified that "[Johnson] said in that moment the tip of his finger slipped into her vagina." Agent Kenser testified that Johnson never used the word "accidently."

On cross-examination, defense counsel emphasized that Johnson denied the allegations repeatedly. Counsel said that when Johnson returned to the interview room, he "finally put two and two together as to how this girl thought she might have been vaginally penetrated." Agent Kenser confirmed those were Johnson's words. Counsel emphasized that Johnson did not say he acted intentionally. But, Agent

Kenser responded that in "the way he portrayed it to me, the way I inferred it, was that it was intentional." Counsel then asked whether Agent Kenser could be mistaken, and the agent replied, "I don't think so." The agent further explained that "the tone of his remarks were that he did it."

The government then rested its case. Defense counsel moved for a judgment of acquittal on all counts. The district court granted the motion as to Counts I-III but denied the motion as to Counts IV-V. Johnson rested without presenting any evidence. After deliberating, the jury returned a guilty verdict on Count V. Thereafter, the district court sentenced Johnson to 152 months of imprisonment.

II.

A.

For a sufficiency of the evidence challenge, we review de novo whether the evidence is sufficient to permit a reasonable jury to conclude that the defendant is guilty beyond a reasonable doubt. United States v. Piwowar, 492 F.3d 953, 955 (8th Cir. 2007). "[W]e review the trial evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." United States v. Zimmermann, 509 F.3d 920, 925 (8th Cir. 2007) (internal quotation omitted).

Count V charged Johnson with sexual abuse of H.S. by contact between Johnson's penis and H.S.'s mouth. The evidence supporting Count V, construed in the light most favorable to the government, was sufficient to permit a reasonable jury to convict Johnson. H.S. stated that Johnson "did mean stuff that he wasn't supposed to do to us" and told her to keep it a secret. When the government asked H.S. if Johnson put his penis in a part of her body, she nodded. She also nodded when the

government asked if he put it in her mouth. H.S. later confirmed that she told the truth and revealed the secret to the court.

Johnson argues that H.S.'s admission that she could not remember the events and her inconsistent testimony at trial undermine the government's case. But the jury determines credibility and weighs conflicting evidence. United States v. Eagle Bear, 507 F.3d 688, 692 (8th Cir. 2007). Further, the jury's credibility determinations are "virtually unreviewable on appeal." United States v. Singh, 494 F.3d 653, 660 (8th Cir. 2007) (internal quotation omitted). Supporting H.S.'s version of the facts was her and her sister's evident fear of Johnson. Circumstantial evidence included Agent Kenser's testimony of sexual abuse of A.S. by Johnson, A.S.'s testimony of "[b]ad things" done to her by Johnson and the accompanying secret, and Dr. Mailloux's testimony supporting the conclusion that it was possible for H.S. to recount truthfully events that occurred when she was very young. The conflicting evidence at trial provides no basis for reversal. The evidence was sufficient to support Johnson's conviction.

B.

For a challenge to the district court's allowance of leading questions, we review for abuse of discretion. United States v. Anderson, 446 F.3d 870, 876 (8th Cir. 2006). Generally, leading questions are not permitted during direct examination of a witness, "except as may be necessary to develop the witness' testimony." Fed. R. Evid. 611(c). This court has long recognized the child witness exception to the general prohibition of leading questions. United States v. Flute, 363 F.3d 676, 678 (8th Cir. 2004). Specifically, this court repeatedly has upheld the use of leading questions to develop the testimony of sexually abused children, especially regarding precise physiological details of the sexual assaults. United States v. Grassrope, 342 F.3d 866, 869 (8th Cir. 2003) (citing cases). The district court is simply "in a better position than this court to determine the emotional condition and forthrightness of the witness and the need

for counsel to use leading questions to develop the witness's testimony." United States v. Nambo-Barajas, 338 F.3d 956, 962 (8th Cir. 2003) (internal quotation omitted). Given the age of H.S., the traumatic subject matter, and her reluctance to testify, the district court did not abuse its discretion in allowing leading questions.

## III.

We affirm the judgment of the district court.

_____