# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 16-3714

———————————————

United States of America

*Plaintiff - Appellee*

v.

Trevor Scott Ray

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the District of South Dakota - Rapid City

——————————

Submitted: March 10, 2017
Filed: May 22, 2017
[Unpublished]

——————————

Before WOLLMAN, COLLOTON, and SHEPHERD, Circuit Judges.

——————————

PER CURIAM.

Trevor Scott Ray was convicted by a jury of three drug-related felonies: conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count I); distribution of 50 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) (Count II); and

possession with intent to distribute and aiding and abetting possession with intent to distribute 500 grams or more of mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2 (Count III). The district court[1] denied Ray's motion for judgment of acquittal and imposed concurrent sentences of 180 months' imprisonment on each count. Ray appeals, arguing that the evidence was insufficient to support the jury's guilty verdicts. We affirm.

We review *de novo* the sufficiency of the evidence to support a conviction, considering the evidence in the light most favorable to the jury's verdict and accepting all reasonable inferences that may be drawn therefrom in its favor. United States v. Kirk, 528 F.3d 1102, 1111 (8th Cir. 2008). Our review of the evidence presented at trial is "highly deferential," and we will reverse a conviction only if no reasonable jury could have found the defendant guilty. Id. (citation omitted). "If evidence consistent with guilt exists, we will not reverse simply because the facts and the circumstances may also be consistent with some innocent explanation." United States v. Griffith, 786 F.3d 1098, 1102 (8th Cir. 2015) ("Even where the evidence 'rationally supports two conflicting hypotheses, [we] will not disturb the conviction.'" (citation omitted)), cert. denied, 137 S. Ct. 70 (2016). We recount the evidence presented at Ray's trial in light of these standards.

In November 2014, Michaela Hofland was caught shoplifting at a discount store while in possession of approximately $2,500 and methamphetamine that she had obtained from Christopher Gabbard. Hofland was admitted to a drug-treatment facility in January 2015, where Ray later appeared for a visit and to provide Hofland with his current contact information. Hofland left the facility in February 2015 with her boyfriend, Nathan Woods. Hofland called Ray, and she and Woods met Ray, Gabbard, and Bill Rensch at a bar in Rapid City to discuss Hofland's outstanding debt

---

[1]The Honorable Jeffrey L. Viken, Chief Judge, United States District Court for the District of South Dakota.

to Ray for "fronted" methamphetamine. Later that day, Hofland met Ray at his workplace, City Wide Auto, and then at his residence, where she paid Ray $900 for her outstanding debt and obtained an ounce of methamphetamine that she thereafter gave to Woods and Chris Daniels. Hofland returned to City Wide the next day, paid Ray for the drugs received the day before, and was fronted another two ounces of methamphetamine for which she agreed to later pay Ray $2,200. Hofland met Ray at a casino two days later; paid him the outstanding $2,200; and was fronted another two ounces of methamphetamine, which she gave to Daniels to sell. Hofland later met Ray at a truck stop, paid him $2,200 for the previously received methamphetamine, and was fronted an additional two ounces. The next day, Hofland again met Ray at City Wide, paid him for the previously received methamphetamine, and was fronted two more ounces, which she again gave to Daniels to sell. Hofland was not using drugs during this period but was engaging in these transactions to make "extra cash." All told, Hofland purchased a total of nine ounces, or 255 grams, of methamphetamine from Ray. When Hofland was arrested on February 11, 2015, she still owed Ray $2,000 for fronted methamphetamine.

Woods had been receiving methamphetamine from Hofland but began dealing directly with Ray after Hofland was arrested. Woods and Ray met at a convenience store in Rapid City, where Woods paid Hofland's outstanding $2,000 debt, and Ray agreed to supply Woods with methamphetamine. Also in February 2015, Woods agreed to work as a confidential informant (CI), after officers searching his home in January 2015 recovered methamphetamine, a firearm, a scale, and small baggies that Woods had used to package drugs for distribution. In violation of his CI agreement, however, Woods met Ray at a department-store parking lot and paid $2,000 for two ounces of methamphetamine. When Ray retrieved the drugs from the center console of his vehicle during the transaction, Woods observed a large freezer bag that was half full of additional methamphetamine. Ray and Woods met again the next day in a casino parking lot, where Woods gave Ray $2,000 for another two ounces of methamphetamine.

Several days later, Woods informed Special Agent Robert Palmer of the South Dakota Division of Criminal Investigation that Ray would sell him two ounces of methamphetamine and would also "front" an additional two ounces. Agent Palmer recorded the telephone call Woods placed to Ray to arrange a meeting at City Wide to conduct the transaction. Agent Palmer provided Woods with $2,000 in pre-recorded cash and fitted Woods with a device to transmit and record the transaction with Ray. Agents searched Woods's person and vehicle before the transaction and surveilled Woods as he drove to meet Ray. Ray took Woods to a back room at City Wide and handed him a packet of methamphetamine. The audio recording captured Woods stating to Ray, "I have two for you," and one man thanking the other before the conversation turned to a vehicle on the City Wide lot. Woods delivered the packet to agents, and later testing determined that it held 112.5 grams of a substance containing methamphetamine.

Woods met Ray again a few days later without informing Agent Palmer, paid $2,000 for two ounces of methamphetamine and was fronted another two ounces. The two met again within days, and Woods paid Ray $2,000 for the previously fronted two ounces, and this time was fronted an additional four ounces of methamphetamine.[2] Woods later failed a drug test administered as part of his CI agreement and was arrested. Upon his release from custody, Woods went to City Wide and was fronted eight ounces of methamphetamine by Ray. All told, Woods purchased a total of twenty-two ounces, or 624 grams, of methamphetamine from Ray, most of which he distributed to others.

Rensch, the owner of City Wide, hired Ray to work for him in February 2015. Rensch had previously been to Ray's home and had seen Ray smoke a substance that Rensch believed was methamphetamine and that Rensch had seen Ray retrieve from

---

[2]Woods admitted to the additional methamphetamine transactions that occurred without Agent Palmer's knowledge only after Woods was charged with federal drug offenses on March 16.

a baggie holding three or four inches of the substance. Ray loaned Rensch $20,000 in cash to help with Rensch's business, and only weeks later, Ray gave Rensch another $12,000 cash without any discussion regarding repayment. Ray received two paychecks from City Wide, neither of which was ever cashed. Rensch approached Mark Bradsky, the owner of Outback Storage in Rapid City, and asked to rent a storage unit in a name other than his own. Bradsky completed the rental paperwork in the name of Rensch's brother, and Rensch paid Bradsky $300 for a one-year lease for storage unit 51. Storage-unit renters could enter the gated Outback storage facility by entering an access code unique to each storage unit. Bradsky maintained a log of the access codes entered into the facility's entry keypad. Bradsky could see the facility entry gate from his office and once observed an individual matching Ray's description and driving a car identical to Ray's gray Corvette arrive at the storage facility and enter the access code for storage unit 51.

On March 25, agents conducting surveillance on Ray observed him leave City Wide and drive to Outback Storage in a gray Corvette, but they were unable to see where Ray went once he entered the facility. On March 31, agents again saw Ray drive from City Wide to Outback Storage in the Corvette, but on this occasion, they were able to observe Ray enter unit 51. A surveillance camera was installed to monitor unit 51, and video footage showed Ray entering the unit on April 3, 5, and 6. Specifically, on April 6, the footage showed Ray arriving at unit 51 in a gray Corvette, opening the unit, removing an item from the unit, and placing it in his vehicle. In addition, video footage from the morning of April 9 showed an individual resembling Gabbard arrive in a silver truck identical to one owned by Ray and regularly driven by Gabbard. The driver of the silver truck traveled slowly through the storage facility as if lost and eventually left without stopping at or opening a storage unit. The silver truck returned about an hour later, and the driver paused at several storage units in the vicinity of unit 51 before finally opening and entering that unit. The truck left the storage facility shortly thereafter.

-5-

Agents obtained warrants to arrest Ray and to search his residence and storage unit 51. Ray was arrested at City Wide on April 9. During the search incident to arrest, agents seized a methamphetamine pipe from the center console of Ray's Corvette, $7,900 in cash from the trunk, and $1,255 from Ray's person. Agents also recovered a set of keys from Ray's vehicle, one of which was stamped "Fortress." At Ray's residence, agents recovered a money-counting machine and a cell phone whose number corresponded to the number that Woods had called to arrange the February 18 controlled buy. When they searched unit 51, agents used the Fortress key seized from Ray's Corvette to open the padlock that secured the door to the unit. The storage unit was empty except for two boxes and a backpack, from which agents recovered small plastic bags, digital scales, and a plastic bag containing a substance that was later confirmed to be 445 grams of a substance containing methamphetamine.

Gabbard, who was subject to an outstanding warrant, was also arrested on April 9, while driving the silver truck that was registered to Ray. During the search incident to arrest, agents seized from Gabbard a small plastic bag containing a white, crystal substance and from the truck several more small plastic bags containing what would later be identified as 411.2 grams of a substance containing methamphetamine. Agents also seized a backpack holding a digital scale from the back seat of the truck, as well as a key stamped "Fortress" from the key ring in the truck's ignition. Agents later confirmed that that Fortress key opened the padlock that secured unit 51.

Ray first argues that the evidence was insufficient to support his conviction for conspiracy as charged in Count I. To establish that a defendant was involved in a conspiracy to distribute a controlled substance, the government must prove that there was an agreement to distribute the drug, that the defendant knew of the agreement, and that he intentionally joined in the agreement. United States v. Garcia-Hernandez, 682 F.3d 767, 773 (8th Cir. 2012). The requisite agreement may be inferred from the facts and circumstances, see id., and a defendant's participation therein may be "proven by evidence tending to show that [he] shared a common purpose or design with his

alleged coconspirators" or that his actions "facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole," United States v. McCoy, 86 F.3d 139, 141 (8th Cir. 1996) (citation omitted). "A defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden." United States v. Nolen, 536 F.3d 834, 842 (8th Cir. 2008) (citation omitted).

As set forth above, the jury heard ample evidence that Ray was involved in an extensive methamphetamine-distribution conspiracy with Hofland, Woods, and Gabbard. Ray contends that this evidence proves only that he had a buyer-seller relationship with Hofland and Woods and thus cannot form the basis for his conspiracy conviction. Although a conspiracy conviction must be supported by proof of more than just a buyer-seller relationship, "we have limited buyer-seller relationship cases to those involving 'only evidence of a single transient sales agreement and small amounts of drugs consistent with personal use.'" United States v. Trotter, 837 F.3d 864, 867-68 (8th Cir. 2016) (citation omitted), cert. denied, 137 S. Ct. 1125 (2017). Ray provided Woods and Hofland distribution quantities of methamphetamine on no fewer than eleven occasions over the course of only a few weeks. These interactions were sufficient to establish that Ray had more than a mere buyer-seller relationship with Hofland and Woods. Moreover, Ray was arrested while in possession of a methamphetamine pipe, more than $9,000 in cash, and a key to a storage unit holding 445 additional grams of methamphetamine and other items indicative of drug distribution. See United States v. Urkevich, 408 F.3d 1031, 1037 (8th Cir. 2005) (concluding that evidence of possession of illegal drugs; drug paraphernalia; and "tools of the drug trafficking trade, including digital scales [and] large amounts of cash," supported defendant's methamphetamine-conspiracy conviction). Applying our highly deferential standard of review, we conclude that the evidence was sufficient for a reasonable jury to find Ray guilty beyond a reasonable doubt of conspiring to distribute more than 500 grams of methamphetamine.

Ray next argues that the evidence was insufficient to support his conviction for distribution of 50 grams or more of methamphetamine to Woods in the controlled buy, as charged in Count II. To sustain a conviction for this offense, the government was required to prove that Ray knowingly and intentionally distributed a controlled substance, knowing at the time that it was a controlled substance. United States v. Jones, 600 F.3d 985, 990 (8th Cir. 2010). Ray argues that Woods's testimony that Ray sold him four ounces, or approximately 112 grams, of methamphetamine was unreliable as a matter of law because Woods conceded that he was not trustworthy. "Assessing witness credibility is the job of the jury and absent extraordinary circumstances . . . , we will not review that assessment." Id. (citation omitted); see also United States v. Johnson, 519 F.3d 816, 822 (8th Cir. 2008) (noting that a jury's credibility determinations are "virtually unreviewable on appeal" (citation omitted)). Such extraordinary circumstances do not exist here. The jury was in the best position to judge Woods's testimony in light of his admissions of untrustworthiness. Moreover, Woods's testimony regarding the controlled buy was corroborated by the agent who provided Woods with the money for the buy, monitored the transaction, and recovered the drugs from Woods immediately thereafter. This evidence was more than sufficient to sustain Ray's conviction for distribution of 50 grams or more of methamphetamine.

Finally, with respect to Count III, Ray challenges only the sufficiency of the evidence to establish that he possessed the 500 grams or more of methamphetamine found by the jury. He contends that the government failed to prove that he knowingly possessed the 445 grams of methamphetamine recovered from storage unit 51 and thus failed to prove that he possessed the requisite 500 grams or more of methamphetamine. We disagree. To convict Ray on Count III, the government had to prove knowing possession and intent to distribute 500 grams or more of methamphetamine. See, e.g., United States v. Blakey, 449 F.3d 866, 869 (8th Cir. 2006) (noting that government must prove knowing possession and intent to distribute). Possession for these purposes may be either actual or constructive, and it

need not be exclusive. Id. To prove constructive possession of the methamphetamine in the storage unit, the government was required to show that Ray exercised "ownership, dominion, or control over" the drugs themselves or over the premises in which they were concealed. Id. "We have said that a 'holder of [a] key, be it to the dwelling, vehicle[,] or motel room . . . has constructive possession of the contents therein.'" Id. (citation omitted). As for intent to distribute, we have held that "[a] large quantity of drugs, standing alone, is sufficient evidence" to establish the requisite intent. United States v. Serrano-Lopez, 366 F.3d 628, 635 (8th Cir. 2004). The evidence is more than adequate to establish Ray's constructive possession of and intent to distribute the 445 grams of methamphetamine recovered from the storage unit. When arrested, Ray had in his possession a key to the storage unit, as well as drug paraphernalia and more than $9,000 in cash. See Jones, 600 F.3d at 990 (noting that intent to distributed a controlled substance may be established by circumstantial evidence such as a large quantity of drugs, "cash, packaging material, or other distribution paraphernalia" (citation omitted)). Agent surveillance and videotape footage established that Ray had accessed the unit on several occasions. The other key to the storage unit was recovered from a ring holding the ignition key to a truck registered to Ray and driven by Gabbard, who had left the storage facility shortly before he was arrested while in possession of 411 grams of methamphetamine packaged for distribution and a digital scale. Although Ray's dominion and control over the storage unit was not exclusive, given Gabbard's access to the padlock key, there was evidence that the two cooperated in the possession and distribution of methamphetamine. See Blakey, 449 F.3d at 869. The evidence thus amply supported the jury's finding that Ray possessed with intent to distribute 500 grams or more of methamphetamine.

The judgment is affirmed.

_____