# United States Court of Appeals
## For the Eighth Circuit
_____

No. 17-1310
_____

United States of America

*Plaintiff - Appellee*

v.

Dallas Wayne Thundershield

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of North Dakota - Fargo
_____

Submitted: February 16, 2018
Filed: August 7, 2018
[Unpublished]
_____

Before SMITH, Chief Judge, MURPHY and COLLOTON, Circuit Judges.[*]
_____

PER CURIAM.

A jury convicted Dallas Wayne Thundershield of second-degree murder, in violation of 18 U.S.C. §§ 1111 and 1153; assault with intent to commit murder, in

_____

[*]This opinion is filed by Chief Judge Smith and Judge Colloton under Eighth Circuit Rule 47E.

violation of 18 U.S.C. §§ 113(a)(1) and 1153; assault with a dangerous weapon, in violation of 18 U.S.C. §§ 113(a)(3) and 1153; and assault resulting in substantial bodily injury, in violation of 18 U.S.C. §§ 113(a)(7) and 1153. On appeal, Thundershield argues that (1) the evidence was insufficient to convict him on all counts, and (2) the district court[2] abused its discretion by admitting evidence of his prior conviction under Federal Rule of Evidence 404(b). We affirm.

## I. *Background*
### A. *Underlying Facts*

"We recite the facts in the light most favorable to the jury's verdict." *United States v. Payne-Owens*, 845 F.3d 868, 870 n.2 (8th Cir. 2017) (quoting *United States v. Stevens*, 439 F.3d 983, 986 (8th Cir. 2006)).

On the evening of April 9, 2016, Thundershield and Priscilla Bear left the home of Bear's sister to walk to a store in Fort Totten, North Dakota, on the Spirit Lake Reservation. While they were walking, two men in a red pickup truck stopped to offer them a ride in exchange for gas money. Elvis Demarce ("Elvis"), the truck's owner, was driving accompanied by his uncle, Richard Dean Demarce Sr. ("Richard"). Thundershield and Bear accepted the ride.

After stopping to get gas, Elvis drove to Saint Michael, North Dakota, to pick up Bear's daughter at the home of Bear's mother. After Bear's daughter got in the truck, Bear asked Elvis if she could drive because Elvis and Richard had been drinking alcohol. Elvis agreed. Bear drove the group to purchase groceries and liquor before continuing to her sister's house in Fort Totten. When they arrived, Elvis, Richard, Bear, and Thundershield carried items inside. Bear left her daughter at her sister's home. As they were getting back into the truck, Thundershield took his knife,

---

[2]The Honorable Ralph R. Erickson, then United States District Judge for the District of North Dakota, now United States Circuit Judge.

poked Bear, and told her "that he was going to take that truck." Transcript of Proceedings, Vol. 3, at 357, *United States v. Thundershield*, No. 3:16-cr-00090-RRE-1 (D.N.D. Oct. 20, 2016), ECF No. 93.

Bear continued driving Elvis's truck with Elvis sitting in the front passenger seat, Richard sitting behind Elvis, and Thundershield sitting behind Bear. As Bear drove, Thundershield again poked her with his knife from the backseat. Elvis, alarmed by Thundershield's act, declared he was going to re-take the wheel. Bear pulled over on the side of the road near a gravel truck trail to let Elvis drive. Elvis exited the truck, and Thundershield immediately followed, knife in hand. Before Elvis could re-enter the truck, Bear saw Thundershield grab Elvis, and a fight ensued with Thundershield still wielding the knife.

Bear called the Fort Totten Law Enforcement Center (LEC) using Elvis's cell phone. Bear called the LEC four times, and each time the line disconnected. Cody LaRoque, a dispatcher with the LEC, recorded in the dispatch log that an unidentified female called four times between 9:07 p.m. and 9:10 p.m. on April 9, 2016. LaRoque testified that during the first call to the LEC, the female caller, later identified as Bear, said someone was stabbed and described the location. LaRoque dispatched Bureau of Indian Affairs Officer Terry Morgan to the location. Bear called back at 9:09 p.m. and again at 9:10 p.m., only to have the calls disconnected by LaRoque because he had other calls and the caller (Bear) was not speaking directly to him. Bear called back immediately after being disconnected at 9:10 p.m. She told LaRoque her location and said that someone had been stabbed. Bear also said "that she did not want to die and that she was going to put her phone in her pocket." Transcript of Proceedings, Vol. 2, at 111, *United States v. Thundershield*, No. 3:16-cr-00090-RRE-1 (D.N.D. Oct. 19, 2016), ECF No. 92. "Throughout the phone being in [Bear's] pocket, [LaRoque] overheard . . . what sounded like a male telling the female to shut the F up and that he is the devil and he's a real killer and he just repeated stuff like that until [LaRoque] had to end that call." *Id.* at 111–12.

During Thundershield's assault of Elvis, Richard remained asleep in the truck. Richard, however, awoke about the time that Bear put the phone in her pocket. Richard said to Bear, "What's going on?" Transcript of Proceedings, Vol. 3, at 362. According to Bear, Richard got out of the truck, and Thundershield started hitting him. Bear testified that as Thundershield fought with Richard, he told her to find the keys to the truck. After subduing Richard, Thundershield dragged Elvis across the road into the ditch. Bear saw Thundershield stomp on Elvis's face. Thundershield put Bear into the passenger seat of the truck and drove away.

According to Bear, as Thundershield drove away from Elvis and Richard, he repeatedly said, "I have to kill them. I have to kill them." *Id.* at 364. Less than a mile away, Thundershield turned the truck around and drove back toward Elvis and Richard's location. Richard was standing on the side of the road trying to wave down the truck as Thundershield approached. According to Bear, Thundershield then "ran over Richard." *Id.* at 364–65. Thundershield then stopped the truck, jumped out, and a few minutes later jumped back in. Thundershield drove west for a short distance before turning around again. Bear saw a truck parked near the bodies of Richard and Elvis flashing its hazard lights. Thundershield continued driving toward Hamar, North Dakota.

Edward Charboneau, who drove the truck that Bear saw at the scene, had arrived minutes at the scene. Charboneau saw a body in the ditch and stopped. He called the Fort Totten Police Department (FTPD). When Charboneau went to check on the first individual, he noticed the second. He called the police back and told them to send two ambulances because there were two individuals in the ditch.

Officer Morgan arrived at the scene at 9:16 p.m. An ambulance arrived minutes later. An EMT and his partner examined Richard. When the EMT removed Richard's shirt, he observed a stab wound to the torso and found no signs of life. The EMT next

examined Elvis, heard Elvis moaning, and saw him rolling around and covered in blood. The EMT noted that Elvis also had a stab wound to his abdomen and another in his back. Elvis's medical condition was critical upon his admission to the hospital.

Medical evidence presented at trial showed that Elvis suffered penetrating wounds to his colon, stomach, and back. Dr. Randolph Szlabick, the attending surgeon, testified that the width of the wound on Elvis's back would have been caused by a "fairly large blade." Transcript of Proceedings, Vol. 4, at 516, *United States v. Thundershield*, No. 3:16-cr-00090-RRE-1 (D.N.D. Oct. 21, 2016), ECF No. 94. When shown the knife recovered near where Elvis's truck was ultimately found, Dr. Szlabick opined that the knife would be consistent with causing the type of wound he described. Elvis survived the attack, but he remembers nothing of the incident.

Dr. Mark Koponen conducted an autopsy on Richard's body and determined that Richard died from a single stab wound to the heart. According to Dr. Koponen, Richard's death would not have been instantaneous, and Richard would have been capable of movement for several minutes. Dr. Koponen observed abrasions on Richard's back and contusions and abrasions on both the right and left knees.

Bear testified that immediately after she and Thundershield saw Charboneau's truck at the scene, Thundershield drove Elvis's truck to Raymond Peltier's home. Peltier's home is near Hamar, North Dakota, which is located on the eastern-most edge of the Spirit Lake Reservation. After Thundershield reached Peltier's home, he drove the truck through a ditch and into a thicket of trees. While at Peltier's home, Bear heard Thundershield tell Peltier, "I think I killed them, Bro." Transcript of Proceedings, Vol. 3, at 368. Peltier testified Thundershield told him, "Hey, Bro, Bro, I just killed two people." Transcript of Proceedings, Vol. 4, at 571.

Thundershield, Peltier, and Bear purchased alcohol and consumed it at Peltier's residence. Peltier passed out on the couch after Thundershield and Bear went into

Thundershield's bedroom. According to Peltier, he was awakened to Bear screaming for him. Peltier saw Thundershield leaned over Bear and "hammer fisting her on the top of the head." *Id.* at 575. Bear testified that Thundershield bruised her eye and cheekbone, bruised her arms and chest, and caused her ankle to bruise and swell during this assault. Bear testified that as Thundershield stomped on her ankle, he exclaimed that she would never walk again.

Peltier did not stop Thundershield's assault on Bear. Instead, he told Thundershield to "[b]ehave" and "[g]o to bed or go to your room." *Id.* Peltier then fell back to sleep. Thereafter, while Peltier was lying on the couch, Thundershield jumped on his back, put his arm around Peltier's neck, and attempted to hit Peltier with a 20-pound weight. Peltier struck Thundershield four times and knocked him out. Peltier told Bear that she and Thundershield needed to leave his house. Bear told Peltier she did not want to go with Thundershield, reminding Peltier that Thundershield had killed two people. Bear and Peltier called the FTPD and reported that Thundershield had killed two people.

Thundershield was arrested on the morning of April 10, 2016, at Peltier's home. Special Agent Terry McCloud of the FTPD testified that he "noticed a single . . . Chevrolet key with a remote key fob on it fall out of [Thundershield's] left front pants pocket onto the bed" once the officers began handcuffing Thundershield. Transcript of Proceedings, Vol. 2, at 219. The keys found in Thundershield's pants fit into the ignition of Elvis's truck. A forensic scientist from the North Dakota State Crime Lab testified that Elvis's blood was on jeans and a boot that Thundershield was wearing on the evening of April 9, 2016.

## B. *Procedural History*

On April 21, 2016, a four-count indictment was filed charging Thundershield with (1) second-degree murder for killing Richard ("Count 1"), (2) assault with intent to commit murder against Elvis ("Count 2"), (3) assault with a dangerous weapon

against Elvis ("Count 3"), and (4) assault resulting in substantial bodily injury against Bear ("Count 4"). The government filed notice of its intent to offer three prior convictions pursuant to Federal Rule of Evidence 404(b). One of those convictions was a tribal court conviction from April 20, 2007, involving an altercation in which Thundershield entered his sister's residence and fought with his sister and her boyfriend. Thundershield struck the boyfriend in the face, causing swelling to both cheeks and his nose. Thundershield struck his sister with a bat, causing cuts and swelling to her left arm, leg, and ankle. The government offered the prior conviction "to establish motive, opportunity, intent, preparation, plan, knowledge, identity, and/or absence of mistake or accident" with regard to Thundershield's assault on Elvis with a dangerous weapon (Count 3). United States' Notice of Intent to Proffer Rule 404(b) Evidence at 5, *United States v. Thundershield*, No. 3:16-cr-00090-RRE-1 (D.N.D. Oct. 11, 2016), ECF No. 43. Thundershield objected to the government's notice of intent to introduce the prior convictions under Rule 404(b).

After hearing the parties' argument, the court admitted only the April 20, 2007 tribal court conviction under Rule 404(b), stating:

> There doesn't seem to be a lot of motive for it that we can figure out. It seems to be a series of irrational acts. The defendant used a weapon to inflict what would have been a blunt force trauma, which is similar to the dumbbell that was used.
>
> This particular conviction is not that old. The defendant plead guilty. I do not believe that the probative value of this is such that it is —or that the prejudice outweighs the—substantially outweighs the probative value of that conviction, and so evidence of the assault and battery conviction of April 20, 2007 is admissible in this case. It's clearly very similar to the charges against Priscilla Bear—or the alleged assault against Priscilla Bear.

Transcript of Proceedings, Vol. 4, at 635.

The jury convicted Thundershield on all four counts, and the court sentenced Thundershield to concurrent terms of life imprisonment on Count 1, 20 years on Count 2, 10 years on Count 3, and 5 years on Count 4.

## II. *Discussion*

On appeal, Thundershield argues that (1) the evidence on all counts was insufficient to convict him, and (2) the district court abused its discretion by admitting evidence of his prior conviction under Federal Rule of Evidence 404(b).

### A. *Sufficiency of the Evidence*

Thundershield argues that his convictions are not supported by sufficient evidence. "[W]e review de novo whether the evidence is sufficient to permit a reasonable jury to conclude that the defendant is guilty beyond a reasonable doubt." *United States v. Johnson*, 519 F.3d 816, 821 (8th Cir. 2008) (citation omitted). At the same time, "[w]e review the sufficiency of the evidence supporting a conviction in the light most favorable to the Government and draw all reasonable inferences in favor of the jury's verdict." *United States v. Beck*, 496 F.3d 876, 878 (8th Cir. 2007) (citation omitted). Under this standard, "we will reverse the conviction only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt." *Id.* at 879 (citation omitted).

First, Thundershield contends that Bear and Peltier were inconsistent and untrustworthy witnesses whom no reasonable juror could have believed. He argues that Bear should not be believed because (1) she has a criminal record, which includes lying to authorities; (2) she was Thundershield's former love interest and, on the night of these events, she discovered love letters from Thundershield's new girlfriend; (3) she was under the influence of alcohol during the events; and (4) a portion of her testimony was fabricated because she testified that Richard was struck by a car at 30 mph, but the testimony of the accident reconstructionist and coroner contradicted her. Thundershield argues that Peltier's version of events was affected heavily by his

drunkenness. Moreover, Thundershield asserts that Peltier testified inconsistently in that he gave three versions of the story: one to law enforcement, a second to the grand jury, and a third to the jury at trial. During all three accounts, it was established that Peltier drank so heavily that he could not recall driving his boss's van to a bar, talking to the two bar owners, purchasing two liters of vodka from the bar owners, driving the van back home, talking with his wife on the phone, and learning from Thundershield that he had killed two people. Thundershield asserts that although Peltier's testimony was offered to corroborate Bear's story, Peltier had to rely on the memories of others to recollect his story. Thundershield maintains that this evidence is insufficient to convict him because no reasonable jury could have believed either Bear or Peltier.

"Attacks on the sufficiency of the evidence that call upon this court to scrutinize the credibility of witnesses are generally not an appropriate ground for reversal." *United States v. McKay*, 431 F.3d 1085, 1094 (8th Cir. 2005) (citation omitted). "[W]e have long held that the jury 'is always the ultimate arbiter of a witness's credibility,' and thus we 'will not disturb the jury's findings' on appeal." *United States v. Brown*, 422 F.3d 689, 692 (8th Cir. 2005) (first quoting *United States v. Espino*, 317 F.3d 788, 794 (8th Cir. 2003); then citing *United States v. Porter*, 409 F.3d 910, 915 (8th Cir. 2005); *United States v. Hill*, 249 F.3d 707, 714 (8th Cir. 2001)). "Memory and bias are matters implicating a witness's credibility and the weight to be given the testimony. They are within the province of the jury, and we are prohibited from evaluating them when reviewing the sufficiency of the evidence." *United States v. Maynie*, 257 F.3d 908, 918 (8th Cir. 2001) (citation omitted).

Thundershield made these arguments challenging Bear's and Peltier's credibility to the jury. The jury rejected them. Thundershield's arguments on appeal do not establish that no reasonable jury could have believed Bear and Peltier. "We have held that a jury is free to believe all, some, or none of a witness's testimony." *St. Jude Med. S.C., Inc. v. Biosense Webster, Inc.*, 818 F.3d 785, 790 (8th Cir. 2016)

(citation omitted). On this record, we will not undo the jury's determination to credit Bear's and Peltier's testimony.

Second, Thundershield argues that the forensic evidence was deliberately or incompetently limited and thus insufficient. He contends that law enforcement limited the forensic investigation to only two locations: the truck and the place the bodies were found. Thundershield contends law enforcement imprudently credited Bear's and Peltier's statements without considering the possibility that either Bear or Peltier were responsible for the crimes charged. Thundershield asserts that law enforcement did not collect Peltier's or Bear's clothes. He acknowledges that agents associated blood found on a pair of boots with him but contends they relied only on Bear's identification of the boots as Thundershield's to do so. Thundershield argues that law enforcement did not independently verify that the boots were his boots. As to a pair of pants found with Elvis's blood on them, he claims that law enforcement presumed those pants were his even though they were found in a pile of other clothes in a laundry room. Thundershield argues that the clothes pile itself could have contaminated the evidence. He suggests that both Peltier and Bear may have had clothes in the pile, and blood could have transferred between the clothing items. While he admits his DNA was found in the truck, he notes that investigators did not take a DNA sample from Peltier. But a DNA sample was taken from Bear, who happens to be Peltier's cousin. Because Bear's DNA could not be excluded from the truck, and because Bear is related to Peltier, Thundershield argues that Peltier too could have been in the truck. Thundershield argues this theory is easily feasible because, as a felon, Peltier's DNA is registered in the system. He asserts that the government's failure to use this DNA for comparison was careless and sloppy. Thundershield also maintains that local law enforcement showed Peltier preferential treatment because he was not arrested despite showing signs of intoxication.

All of these arguments could have been made to the jury. The jury weighs conflicting evidence and makes credibility determinations. *Johnson*, 519 F.3d at 822.

-10-

The jury is also the proper body to determine whether any "[i]nconsistencies and motivations for bias" exist. *See United States v. Dunn*, 723 F.3d 919, 925 (8th Cir. 2013). Viewing the evidence of record, the jury's rejection of Thundershield's arguments is hardly unreasonable. The government's obligation was to present sufficient evidence to the jury such that it could conclude without reasonable doubt that Thundershield committed the crimes alleged. If believed, the evidence presented to this jury was sufficient to convict Thundershield.

Accordingly, we reject Thundershield's attack on the sufficiency of the evidence.

## B. *Rule 404(b)*

Thundershield next argues that the district court abused its discretion in admitting his April 20, 2007 tribal court conviction for assault and battery under Federal Rule of Evidence 404(b)[3] because (1) the government offered the conviction

---

[3]Rule 404(b) provides:

(b) Crimes, Wrongs, or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the

to prove the assault on Elvis, but the district court admitted the conviction to prove the assault on Bear, indicating the prior conviction was admitted solely to show Thundershield's propensity to assault others; and (2) the 2007 assault and the assault on Bear are insufficiently similar—different victims (sister versus girlfriend); different motives; different weapons; and different time periods.

Under these circumstances, if admission of the 404(b) evidence was error, the error did not influence or had only a slight influence on the verdict. *See United States v. Adams*, 783 F.3d 1145, 149 (8th Cir. 2015). "An evidentiary error is harmless when, 'after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'" *United States v. McPike*, 512 F.3d 1052, 1055 (8th Cir. 2008) (quoting *United States v. Lewis*, 483 F.3d 871, 875 (8th Cir. 2007)).

Here, the evidence against Thundershield was overwhelming on all counts. Bear and Peltier testified to the acts they saw Thundershield commit and the statements Thundershield made concerning those acts. Their testimony was corroborated by medical evidence and other testimony. Dr. Koponen conducted an autopsy on Richard's body, revealing he died from a single stab wound to the heart. This was consistent with Bear's testimony that Thundershield had a knife and fought with Richard. Likewise, consistent with Bear's testimony concerning Thundershield's violent acts, the LEC dispatcher testified to hearing a muffled male voice stating "shut the F up and that he is the devil and he's a real killer." Transcript of Proceedings, Vol. 2, at 112. The EMT also substantiated Bear's account of the stabbings, observing, upon his arrival, the stab wound to Elvis's abdomen and another in his back that was

---

prosecutor intends to offer at trial; and

(B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

bleeding heavily. Dr. Szlabick described Elvis as suffering penetrating wounds to his colon, through his stomach, and in his back. He testified that a "fairly large blade" would cause the width of the wound on Elvis's back. Transcript of Proceedings, Vol. 4, at 516. When shown the knife recovered near where Elvis's truck was ultimately found, Dr. Szlabick opined that the knife would be consistent with causing the type of wound he described. Additionally, when Thundershield was arrested, a key fob was recovered from his pants pocket that fit the ignition of Elvis's truck, further substantiating Bear's account of events. Finally, a forensic scientist from the North Dakota State Crime Lab testified that Elvis's blood was on jeans and a boot that Thundershield wore on the evening of April 9, 2016. "Under these circumstances, if admission of the 404(b) evidence was error, it was harmless beyond any reasonable doubt." *Tran*, 16 F.3d at 907.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____