# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3131

_____

United States of America

*Plaintiff - Appellee*

v.

Michael K. Scott

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 11, 2013
Filed: October 22, 2013

_____

Before RILEY, Chief Judge, BRIGHT and BENTON, Circuit Judges.

_____

RILEY, Chief Judge.

A jury convicted Michael K. Scott of two counts of bank robbery, in violation of 18 U.S.C. § 2113(a), (d); two counts of using a firearm during a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c); and one count of being a felon in possession

of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The district court[1] sentenced Scott to concurrent sentences of life imprisonment on each of the convictions for using a firearm during a crime of violence to be served consecutively to 115-month concurrent sentences on the remaining three counts. Scott appeals, and we affirm.

## I.    BACKGROUND

On February 3, 2010, a grand jury in the Western District of Missouri indicted Scott on seven counts. Counts one and two (bank robbery and using a firearm during a crime of violence, respectively) related to the September 2, 2008, robbery of the Bank Midwest in Kansas City, Missouri. Counts three and four (also bank robbery and using a firearm during a crime of violence, respectively) related to the June 19, 2009, robbery of the Valley View Bank in Kansas City, Missouri. Counts five and six (same) related to the January 27, 2010, robbery of the Commerce Bank in Parkville, Missouri. Count seven charged Scott with being a felon in possession of a firearm.

### A.    Bank Robberies

The three bank robberies followed the same script. Unfortunately for Scott, that script ended with a police chase, an arrest, and a life sentence. In each robbery, a group of masked men burst into a Kansas City-area bank brandishing guns, ordered everyone in the bank to lie down, and forced a bank employee to open the vault. After emptying the vault, the men made their getaway in a stolen vehicle. The men returned to a public location near the bank where a previously parked, non-stolen car awaited them, ditched the stolen vehicle, and drove off in a car the police would have no reason to suspect—or so the culprits thought.

---

[1]The Honorable David Gregory Kays and the Honorable Ortrie D. Smith, United States District Judges for the Western District of Missouri, adopting the reports and recommendations of the Honorable Robert E. Larsen, Chief Magistrate Judge for the Western District of Missouri.

But the robbers repeatedly gave themselves away. In the first robbery, rather than not mentioning anyone's name or strictly referring to each other by an alias, one of the men told the shortest of their bunch "*Mike*, c'mon. Let's go." (Emphasis added). Michael Scott is 5'4". Then, Scott and the other robbers abandoned the stolen vehicle under the eyes of surveillance cameras, which recorded them dropping off Scott's Jaguar and driving away in the stolen vehicle shortly before the robbery and then returning and driving off in the Jaguar shortly after the robbery. As they sped away, the Jaguar cut-off a driver who was friends with a local police officer. The driver was suspicious because he observed one of the men in the car changing clothes, so he noted the Jaguar's license plate number and called his police officer friend, who immediately notified the officers investigating the nearby bank robbery. The Jaguar license plate number check identified Scott. By the end of the day, Scott's Jaguar was in FBI custody. In the car, officers found a dark mask containing Scott's DNA.

Scott went to retrieve his car from the FBI, and while he waited in the lobby (not in custody) he struck up a conversation with an FBI agent—about bank robberies. Explaining he knew about bank robbery because one of his neighbors had robbed banks, Scott told the FBI agent he "wouldn't drive his vehicle, his personal vehicle, a foreign made Jaguar up in front of a bank and go in and rob the bank." Only a "youngster" would do that, Scott said. Instead, Scott explained he would "steal a vehicle" and "drive up to the bank" in that stolen vehicle.

In the second robbery, the men removed their masks as they drove away from the bank in a stolen van. This allowed a woman standing in the parking lot to see their faces as they drove by. The woman, Sandra Herdler, told police the van's license plate number and later identified Scott as the van's driver and Claude White, who later pled guilty to robbing the bank, as the passenger.

In the third robbery, Scott took money containing a tracking device, and local police immediately were able to follow him. Scott led police on a high-speed chase

through a residential area, driving through yards, a field, and a fence before coming to a stop at a terrace embankment. Kansas City, Missouri, police officer Larry White arrested Scott. In Scott's vehicle, police found, among other items, bundles of money, two firearms, and a mask used in the robbery.

### B.    Motions

On December 14, 2010, Scott moved to (1) sever the bank robbery counts and (2) suppress evidence obtained from the search of his Jaguar. The magistrate judge denied the motion to sever, finding joinder proper under Federal Rule of Criminal Procedure 8(a), and severance unjustified under Rule 14(a).

The magistrate judge held a suppression hearing on April 4, 2011. The hearing centered on the September 2, 2008, search of Scott's Jaguar. Testimony at the hearing established that officers went to Scott's apartment complex on September 2, 2008, and saw a woman—later identified as Michon Starnes—drive up in a Jaguar. She parked, got out with three children, and entered the apartment building. With their guns holstered, FBI Special Agent Leena Ramana and two Kansas City, Missouri, police officers knocked on the door; Starnes answered. Agent Ramana identified herself and asked to speak about the Jaguar. Starnes agreed to allow the officers to check the apartment. Additional officers entered the apartment, conducted a security sweep with guns drawn, then these officers left the apartment. At that point, all guns were holstered.

Starnes told Agent Ramana that Scott lived in the apartment, she and Scott were in an "on again, off again" relationship, and the last time she saw Scott was that morning at 6:00 a.m. when she walked to work. Starnes reported the Jaguar was Scott's, but she then had the only set of keys to the Jaguar, and she was the primary driver because Scott's license was suspended. Starnes told Agent Ramana that Scott left the Jaguar at her workplace earlier that day for her to drive home because it was raining. Starnes agreed to allow the officers to search the car. Starnes accompanied

Agent Ramana and three other officers to the Jaguar, signed a written consent, and opened the Jaguar's door and trunk. Starnes testified the officers "didn't force [her]" to consent and her consent was voluntary: "They asked and I said yes."

Based on this evidence, the magistrate judge issued a report on October 3, 2011, recommending denial of Scott's motion to suppress. Scott objected. On November 7, 2011, the district court overruled Scott's objections, adopted the magistrate judge's report and recommendation, and denied Scott's motion to suppress. The district court rejected Scott's contention that Starnes's consent was invalid and involuntary, finding Starnes "had common authority over the Jaguar," "the law enforcement officers had reason to believe common authority existed," and Starnes voluntarily consented.

### C.    Conviction and Sentence

On January 13, 2012, at the conclusion of a five-day trial, a jury found Scott guilty of robbing Bank Midwest and Commerce Bank, using a firearm during those robberies, and being a felon in possession of a firearm (Counts 1, 2, 5, 6, and 7), but not guilty of robbing and using a firearm while robbing the Valley View Bank (Counts 3 and 4). Both parties agreed the statutory mandatory minimum sentence was approximately 39 years, but the government sought a life sentence based on Scott's criminal history.

On August 30, 2012, after considering "all the factors in fashioning a punishment," the district court[2] sentenced Scott to life imprisonment on counts 2 and 6, to be served consecutively to a 115-month prison term—the top end of the United States Sentencing Guidelines (Guidelines) range—on counts 1, 5, and 7. The district court explained the sentence was "an upward variance based upon [Scott's] criminal history and the need to protect the public." The district court "struggled" to find the just punishment, and ultimately found the life sentence justified based on Scott's long

---

[2]On January 9, 2012, Judge Smith transferred the case to Judge Kays.

criminal history (beginning with burglary, robbery, and aggravated assault at age 15, followed by bank robbery at age 19), the need to protect the public, and the nature and circumstances of the offense. "This is a bank robbery done with guns," the district court noted. "I think at least one person fainted or was on the ground in terror, something of that nature," the district court continued. Given the risk linked to Scott's conduct, the district court observed "the community is fortunate that no one died or was hurt in a serious way during the course of [Scott's] actions."

## II.    DISCUSSION

In this appeal, over which we have jurisdiction under 28 U.S.C. § 1291, Scott challenges the district court's (1) denial of his motion to sever the charges, (2) denial of his motion to suppress evidence obtained from a search of his car, and (3) imposition of life sentences. We reject each challenge in turn.

### A.    Severance

Whether charges may be joined under Federal Rule of Criminal Procedure 8(a) is a legal question, which we review de novo. See United States v. Tyndall, 263 F.3d 848, 849 (8th Cir. 2001). A district court's denial of a motion to sever properly joined charges under Federal Rule of Criminal Procedure Rule 14(a) is reviewed for abuse of discretion. See United States v. Young, 701 F.3d 1235, 1238 (8th Cir. 2012). We "will not reverse unless the defendant shows [any] abuse of discretion result[ed] in severe prejudice." United States v. Steele, 550 F.3d 693, 702 (8th Cir. 2008). "'Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that [the defendant] would have had in a severed trial.'" United States v. Taken Alive, 513 F.3d 899, 902 (8th Cir. 2008) (alteration in original) (quoting United States v. Koskela, 86 F.3d 122, 126 (8th Cir. 1996)). Our review leads us to conclude the district court properly denied Scott's motion to sever.

First, the joinder of all seven charges against Scott did not violate Rule 8(a).[3] The three bank robberies were "of the same or similar character," the felon in possession charge was "based on the same act or transaction" as the third bank robbery, Fed. R. Crim. P. 8(a), and the crimes "occurred over a 'relatively' short period of time." Tyndall, 263 F.3d at 850. The modus operandi in each of the three bank robberies was the same, and the last set of crimes (i.e., those relating to the Commerce Bank robbery) occurred fewer than seventeen months after the first set of crimes (i.e., those relating to the Bank Midwest robbery). Seventeen months is a sufficiently short time under Rule 8(a). See United States v. Lindsey, 782 F.2d 116, 117 (8th Cir. 1986) (per curiam); see also, e.g., United States v. Rodgers, 732 F.2d 625, 629-30 (8th Cir. 1984) (finding twenty months was short enough).

Second, joining all charges related to the three bank robberies resulted in no "appear[ance] [of] prejudice" to Scott. Fed. R. Crim. P. 14(a). The acquittals on counts three and four speak for themselves: the jury weighed the evidence as to each count separately, finding some reasonable doubt as to Scott's complicity in the Valley View Bank robbery despite otherwise compelling evidence, including Herdler's eyewitness identification. The government could have admitted evidence related to Scott's modus operandi, which he openly discussed with an FBI agent, in separate trials. See Fed. R. Evid. 404(b) (permitting "[e]vidence of a crime, wrong, or other act . . . . [to] prov[e] . . . plan, knowledge, [or] identity."); United States v. Boyd, 180 F.3d 967, 983 (8th Cir. 1999) ("As the evidence would have been admissible in a

_____

[3]Although the indictment joined both offenses and defendants, Scott never argued, either in the district court or on appeal, joinder was improper under Rule 8(b). Cf. United States v. Mann, 701 F.3d 274, 289 (8th Cir. 2012) ("Where an indictment joins defendants as well as offenses, the propriety of the joinder of offenses is governed by Rule 8(b), rather than Rule 8(a)."). Any such argument is therefore waived. See, e.g., United States v. Greene, 513 F.3d 904, 906 (8th Cir. 2008). Even if Scott had preserved such an argument, he could not show prejudice from any Rule 8(b) misjoinder because he was not tried alongside any other defendant. See, e.g., Mann, 701 F.3d at 290.

separate trial for another crime under Rule 404(b), a joint trial does not result in additional prejudice."). Scott has fallen far short of showing the "severe prejudice" required for reversing the district court's denial of his motion to sever. Steele, 550 F.3d at 702.

### B.     Suppression

"When reviewing a district court's suppression determination, we review the court's factual findings for clear error and its legal conclusions de novo." United States v. Quintero, 648 F.3d 660, 665 (8th Cir. 2011). "The voluntariness of a consent to search is a factual question that is reviewed for clear error." United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007). We discern no error in the district court's conclusions (1) Starnes "had common authority over the Jaguar," and (2) Starnes voluntarily consented to the search.[4]

### 1.     Common Authority

As a legal matter, "[c]onsent to search, a valid exception to the warrant requirement, Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973), may be given either by the suspect or by some other person who has *common authority* over, or sufficient relationship to, the item to be searched." United States v. James, 353 F.3d 606, 613 (8th Cir. 2003) (emphasis added) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)). The district court correctly concluded that the search of the Jaguar did not violate the Fourth Amendment if Starnes had common authority over the car.

As a factual matter, the district court did not clearly err in finding Starnes had common authority over the Jaguar based on "mutual use, joint access, and control." Id. ("Common authority . . . is a question of fact."). Starnes not only drove the Jaguar,

---

[4]Because we agree with the district court's analysis, we need not consider the government's contention that because the mask was in plain sight the officers did not need Starnes's consent.

but explained to the officers that she was the Jaguar's only licensed driver (Scott's license was suspended). Starnes had the only key to the car, and earlier that day Scott expressly told Starnes she could drive the car home from work. Even if Scott is correct that he gave Starnes only narrow permission to drive the car home from work because it was raining, Starnes described for the officers her control over the car in broad terms sufficient to give a reasonable appearance of authority. See United States v. Nichols, 574 F.3d 633, 636 (8th Cir. 2009) (explaining the Fourth Amendment does not require suppression of the fruits of a search conducted in "reasonabl[e] rel[iance] on the consent of a third party who demonstrates apparent authority to authorize the search, even if the third party lacks common authority").

### 2. Consent

Given that Starnes testified she freely "said yes" and unlocked the car herself, the district court did not err in finding her consent voluntary. Scott's argument to the contrary relies entirely on the number of officers present and the fact that some of the officers had their guns drawn when those officers secured the apartment premises. This reliance is doubly misplaced.

First, the district court reasonably refused to credit Starnes's testimony that there were "ten to fifteen law enforcement officers." Second, the evidence shows that at the time Starnes consented to the search, only a few officers were present, all with their guns holstered. The security sweep of the apartment, conducted by officers with guns drawn, was an understandable security measure considering the perpetrators of the Bank Midwest robbery were heavily armed. The security sweep ended before Agent Ramana interviewed Starnes and asked for her consent to search the Jaguar. The district court's finding that Starnes voluntarily consented was amply justified by the evidence. See Quintero, 648 F.3d at 667; United States v. Kelley, 594 F.3d 1010, 1013 (8th Cir. 2010).

### C. Sentence

We review a district court's sentencing decision for abuse of discretion. See, e.g., United States v. Washington, 515 F.3d 861, 865 (8th Cir. 2008). We begin by "ensur[ing] that the district court committed no significant procedural error." Gall v. United States, 552 U.S. 38, 51 (2007). Once assured the sentence is "procedurally sound," we "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard[,] . . . . tak[ing] into account the totality of the circumstances." Id. Consistent with Gall, we defer to the district court's conclusion that Scott deserved two life sentences because the district court (1) carefully considered the § 3553(a) factors, and (2) imposed a substantively reasonable sentence.

First, the district court committed no significant procedural error. Scott admits the district court correctly calculated Scott's advisory Guidelines range and "relied on the [§ 3553(a)] factors." Scott argues the district court erroneously believed "at least one person [in the bank robbery] fainted or was on the ground in terror, something of that nature." It is true there is no evidence anyone fainted, but Scott ignores the critical "or" in the district court's statement. The record shows several individuals were "on the ground in terror" and were deeply traumatized by the experience. The district court did not base the sentence on "clearly erroneous facts." Id.

Neither did the district court fail to explain adequately its reasons for varying upward. The district court explained the sentence was "an upward variance based upon [Scott's] criminal history and the need to protect the public." The district court noted Scott had "spent a lot of [his] life in prison," but "prison hasn't had much of a rehabilitative effect upon [Scott], [who] continue[d] to commit crimes involving guns subsequent to [his] release." By "locking Michael Scott up," the district court said, "we know there's not going to be any more bank robberies, at least at his hands, and we won't have to worry about [Scott] possessing a gun."

-10-

Second, the sentence was substantively reasonable. Viewed with "due deference" to the district court's careful consideration of the § 3553(a) factors, the record amply shows life sentences were justified for the reasons described by the district court. Id. at 51-52. Scott's sole argument to the contrary centers on his age: 56 at the time of sentencing. A defendant's "advanced age" is a possible, but *not* mandatory, basis for granting a downward variance. See United States v. Chase, 560 F.3d 828, 831 (8th Cir. 2009). "Advanced age," under some circumstances, could itself be a basis for an upward variance. The record shows the district court carefully considered all § 3553(a) factors, "struggled" to find a "just punishment," "considered the arguments of the counsel involved in the case," and determined a life sentence was appropriate given Scott's extensive criminal history and the need to protect the public.

It does not matter whether we might think a lesser sentence more justified because even the statutory minimum sentence would keep Scott in federal prison past the age of ninety.[5] The Supreme Court has instructed us that the mere "fact that the

[5]Geriatric prisoners place a heavy financial strain on the prison system. See, e.g., Ashby Jones & Joanna Chung, Care for Aging Inmates Puts Strain on Prisons, Wall St. J., Jan. 27, 2012, at A2 (reporting on the high health-related costs associated with America's rapidly aging prison population, although noting taxpayers will pay for these health costs whether the individual is in or out of prison). Although violent crime rates decrease with age, the young do not have a monopoly on violence. See, e.g., Catherine F. Lewis et al., A Study of Geriatric Forensic Evaluees: Who Are the Violent Elderly?, 34 J. Am. Acad. Psychiatry L. 324 (2006).

Of course, the wisdom of incarcerating elderly offenders as a categorical policy matter is for Congress, not us, to decide. "[T]he relevant policy considerations do not invariably point in one direction, and there is vehement disagreement over the validity of the assumptions underlying many of them. The very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable." Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 513 (1982) (footnote omitted). Thus, while encouraging sentencing courts to consider a defendant's age, we defer to each sentencing court's case-by-case judgment on whether a particular defendant's age justifies a lesser or

appellate court might reasonably have concluded that a different sentence was appropriate is *insufficient* to justify reversal of the district court." Gall, 552 U.S. at 51 (emphasis added). Consistent with our limited appellate role in sentencing, we conclude the sentence was substantively reasonable. See, e.g., United States v. Stults, 575 F.3d 834, 849 (8th Cir. 2009) ("Where [a] district court in imposing a sentence makes 'an individualized assessment based on the facts presented,' addressing the defendant's proffered information in its consideration of the § 3553(a) factors, such sentence is not unreasonable." (quoting Gall, 552 U.S. at 50)).

## III.   CONCLUSION
We affirm.

BRIGHT, Circuit Judge, dissenting.

I concur with the majority's decisions concerning severance and the evidentiary ruling, but I respectfully dissent as to the sentencing issue.

The sentence of 115 months in prison plus two life sentences imposed on Michael Scott by the district court represents a prime example of what may be called "gilding the lily." It is unreasonable and excessive. For all practical purposes, the roughly 39-year mandatory minimum sentence in this case—for a defendant who is 56 at the time of sentencing—would have itself amounted to a sentence of life imprisonment. I ask what more is required. The sentence in this case is unreasonable and simply represents an effort to send a message of being tough on crime. But that's not the purpose of a sentence.

Prior to the enactment of the Sentencing Guidelines, one of America's great jurists, Judge Edward Devitt of the District of Minnesota, observed that "[a] short

---

greater sentence. See United States v. White, 506 F.3d 635, 644 (8th Cir. 2007).

-12-

sentence will most likely accomplish the same objective.  It is primarily the fact of incarceration, not the length of it, which best serves the ends of justice." Hon. Edward J. Devitt, *The Ten Commandments for the New Judge*, 47 A.B.A. J. 1175, 1177 (Dec. 1961).  Although the Guidelines do not reflect this principle, I believe it is still important and should apply in cases such as this.

As an appellate judge, I add another observation.  The federal courts are now entering a new era of sentencing.  Eric H. Holder, Jr., the United States Attorney General, has recently called for a new approach to criminal sentencing in the federal courts.  The Attorney General emphasized the harsh reality that, as it stands today, "our system is in too many respects broken."  Eric Holder, Attorney General of the United States, United States Department of Justice, Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013), *available at* http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html. Indeed, I agree with the Attorney General that "too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason." *Id.*

The clearly excessive sentence imposed in this case illustrates very graphically the broken criminal justice system in the federal courts.  Here, had Scott received a 39-year sentence—which the parties agreed was the mandatory minimum sentence in this case—he would be in prison until he was 95 years old.  Yet the district court felt the need to impose a 115-month sentence followed by two life sentences.  The district court justified the sentence by emphasizing Scott's "criminal history and the need to protect the public."  But just how much protection does the public need from a 95-year-old man—assuming Scott were to live that long? According to the National Vital Statistics Reports, at the time he was sentenced, Scott was expected to live for another 27 years, or until he is about 83 years old.  *See* Sherry L. Murphy et al., National Center for Health Statistics, National Vital Statistics Reports, Vol. 61, No. 4, at 30 (May 8, 2013), *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_04.pdf.  A 39-year sentence would have been more than enough to serve as

a deterrent and an appropriate punishment for a series of bank robberies, during which no one fired a gun and no one was physically injured. But instead, the district court imposed a substantially unreasonable sentence that is greater than necessary to accomplish the goals of sentencing. *See* 18 U.S.C. § 3553(a). This sentence is not justified and is improper and I will not affirm a sentence that is obviously too harsh and imposed simply to appear tough on crime.

I would reverse and remand this case with instruction to the district court to impose a sentence no greater than a 39-year sentence.

_____