# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-1014

_____

United States of America

*Plaintiff - Appellee*

v.

Walter Ronaldo Martinez Escobar

*Defendant - Appellant*

_____

No. 17-1018

_____

United States of America

*Plaintiff - Appellee*

v.

Jose Manuel Rojas-Andrade

*Defendant - Appellant*

_____

No. 17-1059

_____

United States of America

*Plaintiff - Appellee*

v.

Jason Allen Jackson

*Defendant - Appellant*

_____

No. 17-1170

_____

United States of America

*Plaintiff - Appellee*

v.

Trinidad Jesus Garcia

*Defendant - Appellant*

_____

No. 17-1172

_____

United States of America

*Plaintiff - Appellee*

v.

Catarino Cruz, Jr.

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: February 14, 2018
Filed: November 26, 2018

_____

Before SMITH, Chief Judge, MURPHY and COLLOTON, Circuit Judges.[*]

_____

SMITH, Chief Judge.

A jury convicted Walter Ronaldo Martinez Escobar, Jason Allen Jackson, and Catarino Cruz, Jr., of federal crimes related to a methamphetamine distribution operation. Jose Rojas-Andrade and Trinidad Garcia pleaded guilty to counts related to the same operation. The district court[1] imposed sentences of 137 months to 330 months. These five appellants appeal a variety of issues related to their convictions and sentences. We affirm.

## I. *Background*
### A. *Underlying Facts*

Following a lengthy investigation, 13 people—including the five appellants—were indicted in a large drug-trafficking conspiracy. The investigation focused on Jesse Garcia ("Jesse"), a multi-pound methamphetamine distributor.

In June 2015, the Drug Enforcement Administration (DEA) became involved in the Dakota County Drug Task Force and St. Paul Narcotics Unit's ongoing investigation of Jesse. The DEA learned that these local law enforcement agencies had conducted surveillance at Jesse's residence on approximately May 25, 2015, and

---

[*]Chief Judge Smith and Judge Colloton file this opinion pursuant to 8th Cir. Rule 47E.

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

stopped a vehicle believed to have recently left a residence associated with Jesse. Rojas-Andrade and Juan Noyola-Garcia ("Noyola") were in the vehicle. Law enforcement searched the vehicle and recovered $45,000 from under the passenger seat.

On June 16, 2015, law enforcement responded to a call from the Northwood Inn and Suits in Bloomington, Minnesota, relating to a customer's claim of theft. Trinidad Garcia ("Garcia"), Jesse's brother, was a maintenance worker there. A witness identified Garcia as the suspect. Law enforcement arrested Garcia for an active warrant on an unrelated matter. During the booking process at the jail, law enforcement recovered 39.34 grams of methamphetamine (36.58 actual grams of methamphetamine) from Garcia's underwear. Garcia possessed the methamphetamine with the intent to distribute it to others. Authorities connected Garcia's drugs to Jesse as the supplier.

During the early stages of the investigation, law enforcement placed GPS trackers on several vehicles that Jesse used. These GPS trackers enabled law enforcement to identify a house in rural Wisconsin ("Wisconsin stash house") as a location that Jesse and other coconspirators frequented. Law enforcement installed a pole camera. It was determined that Jesse's supply came from the Wisconsin stash house operated by a Rojas-Andrade, Noyola, and a third coconspirator. These individuals worked for a Mexican man and his girlfriend, Guadalupe Garibay Sanchez, to supply Jesse and others with methamphetamine. They used the Wisconsin stash house to store drugs and money. Rojas-Andrade recruited Noyola and Escobar to assist him with the methamphetamine operation.

Law enforcement discovered that Jesse changed his phone about every 30 days. Law enforcement attempted to obtain wiretaps on four of Jesse's phones but were able to intercept only two of the phones—"TT2" and "TT4." The interception of TT2 lasted only three days—July 17 to July 19, 2015. During those days, law enforcement

-4-

intercepted calls between Jesse and two of his distributors, including David Bennett. The interception of TT4 lasted about one week—August 12 to August 19, 2015. The intercept enabled the seizure of 50 pounds of methamphetamine from Jesse and a seizure of another 30 pounds from the Wisconsin stash house, which ended the investigation.

After interceptions of TT4 began, on August 12, 2015, law enforcement intercepted a call between Jesse and Cruz, who was one of Jesse's sources of methamphetamine. In the call, Cruz explained that he was "checking" on Jesse. Appellee's App. at A-79 (Ex. 18). Jesse updated Cruz on the status of his drug trafficking, telling Cruz that it was "kind of slower right now 'cause ah, we lost some people and shit, so it's kind of slowed down a little bit." *Id.* Jesse's description of having "lost some people" referred to arrests earlier that summer of two of Jesse's distributors, John Schatz and William Chevre. Cruz replied, "That's fine. I was just checking in with you." *Id.* at A-80 (Ex. 18).[2] Based on this call, law enforcement believed that Cruz was a methamphetamine source for Jesse, and Jesse was informing Cruz that Jesse was not ready for any additional methamphetamine at that time. Additionally, surveillance and tracking devices on Jesse's vehicle confirmed that Jesse traveled to Cruz's residence on May 5 and June 11, 2015.

On August 13, 2015, law enforcement intercepted multiple calls between Jesse and Jackson, a methamphetamine distributor. During their conversations, Jesse and Jackson discussed Jesse's recent financial losses and Jackson's repayment of his debt to Jesse. Jesse told Jackson he had to "go switch up cars," *id.* at A-87 (Ex. 26), and "grab them things," *id.* at A-86 (Ex. 26), before meeting with Jackson. This meant that Jesse was going to get a car (a Kia) that he often used when he had methamphetamine

---

[2]At the end of this quotation appears an unintelligible statement that the transcript refers to as "[U/I]." *Id.*; *see also United States v. Dale*, 614 F.3d 942, 952 (8th Cir. 2010) (explaining "[UI]" means "unintelligible statement"). For readability, we have omitted "[U/I]" from any quotations to the record.

with him and get the methamphetamine before meeting Jackson. Jackson confirmed that he had all the "paper" (money) "[t]owards the whole . . . debt." *Id.* at A-88 (Ex. 26). They agreed to meet that day at a restaurant. Jesse arrived in the Kia, and Jackson arrived in another vehicle. Both vehicles thereafter left the restaurant's parking lot, with Jackson returning to his residence. He was observed exiting his vehicle with bags. Right after meeting with Jackson, Jesse contacted Cruz, stating, "I probably need to see you like tomorrow or the next day." *Id.* at A-90 (Ex. 30). Cruz responded, "Are they paying or what?" *Id.* Jesse then explained that none of them were getting paid yet and that he would only need "half of that maybe." *Id.*

On August 14, 2015, Bennett called Jesse about meeting to complete a drug transaction. Jesse asked Bennett if Bennett wanted "[j]ust the one." *Id.* at A-93 (Ex. 33). Jesse explained that he only had "three of 'em left" and that he was "just buying cash right now." *Id.* Jesse had "lost so much money [that he was] pretty much down to . . . just grabbing." *Id.* (ellipsis in original). Bennett told Jesse to "bring two, just in case," and Jesse asked that Bennet "let [him] know for sure if [Bennett] need[ed] two of them. *Id.* Later, Jesse and Bennett completed the drug transaction in a residential neighborhood.

Jesse and Bennett met again on August 15, 2015, and conducted another drug transaction in the neighborhood. Prior to their meeting, Jesse traveled to a residence on Case Avenue, entered the residence for approximately five minutes, and exited the residence with something in his hand. Jesse then drove to meet Bennett. Following their meeting, Bennett was pulled over by the Minnesota State Patrol. Law enforcement recovered over a pound of methamphetamine and two stolen handguns from his vehicle.

After meeting with Bennett, Jesse called Cruz, telling him that he had "picked up some {cash}" and Cruz should "come grab it tomorrow." *Id.* at A-99 (Ex. 48) (alteration in original). They spoke before 6 p.m. on August 16, 2015, and agreed to

meet at Jesse's residence in Coon Rapids, Minnesota. At 6:00 p.m. on August 16, 2015, law enforcement intercepted a call between Cruz and Jesse in which Cruz informed Jesse that he was outside. At the same time, a minivan arrived at Jesse's residence. Cruz's stepdaughter, Sanchez, was the driver, and Cruz was the passenger.

Within an hour of the meeting between Jesse and Cruz, Jesse spoke to his Mexican source of supply. During the call, Jesse explained that he was traveling to Duluth, Minnesota, "taking like five up there right now" and that he has been using an alternative source of supply, "working, with some other {dudes} right now." *Id.* at A-101 (Ex. 58) (alteration in original). Jesse explained to his Mexican source that he needed to buy from this alternative source (Cruz) because Jesse "lost a lost of money and you guys had been out." *Id.* at A-102 (Ex. 58). Jesse feared that his "people [would] go somewhere else" if he did not obtain more drugs. *Id.* Jesse told the Mexican source, "[I]f I don't keep making money then shit, I'm gonna go broke, you know what I'm saying? So . . . so I been somewhere else right now. Just getting like ten at a time, cash money, you know?" *Id.* (ellipsis in original). Jesse and the Mexican source also discussed Jesse's outstanding debt to the Mexican source. Jesse stated, "I just lost a lot of {money}, but yeah, I got the twelve, you know?" *Id.* (alteration in original). Jesse asked the Mexican source to have one of the Wisconsin stash house operators, Rojas-Andrade, contact him the next day to meet at the gas station near the Wisconsin stash house to collect the money. On August 17, 2015, Jesse went to the gas station near the Wisconsin stash house and provided Escobar and Noyola approximately $6,000.

The Mexican source had indicated to Jesse that he would be able to provide Jesse with a large quantity of methamphetamine. On the morning of August 18, 2015, Rojas-Andrade called Jesse to determine when Jesse would pick up the methamphetamine. Rojas-Andrade gave the phone to Escobar, and Escobar explained to Jesse that there were "fifty special for you." *Id.* at A-106 (Ex. 67).

Following the call, Jesse contacted a number of coconspirators to inform them of the imminent arrival of 50 pounds of methamphetamine. Jesse told Cruz, "I guess those guys got the shit in now for me, so um . . . I don't know . . . when I need something next. I don't know yet. When I go check out see what they got and shit . . . hopefully it's good." *Id.* at A-112 (Ex. 72) (ellipses in original). He also notified his distributors, Chevre and Jackson. He told Chevre, "I gotta get going here, get building back up man, but I need you on my team for sure . . . . These dudes just [expletive] came through with the other one so I gotta pick up like fifty of them." *Id.* at A-116 (Ex. 77). Jesse told Jackson, "[T]hese fools are ready to go, they got fifty of them for me man, but they want us to [expletive] get on our hustle and shit in a major way. . . . [T]hey want me to come with some paper though to grab these fifty." *Id.* at A-110 (Ex. 71). Jackson met with Jesse the evening of August 18, 2015, and provided him with just over $16,000.

Following Jesse's meeting with Jackson, Jesse spoke with the Mexican source of supply. The Mexican source wanted to know if Jesse would be able to handle receiving 50 pounds of methamphetamine. Jesse replied, "I don't know I mean I was gonna take less than that cause like right now, I'm slow as hell right now, but I just picked up some money but I'm gonna go count it right now so I don't know how much I got right now." *Id.* at A-118 (Ex. 78).

Jesse counted the money he received from Jackson on August 19, 2015. Jesse called Jackson and told him that the cash amounted to "[s]ixteen thousand, twenty dollars." *Id.* at A-125 (Ex. 82). Jackson responded that there "should've been like twenty six [thousand]." *Id.*

Earlier in the day on August 19, 2015, Cruz had called Jesse to find out whether Jesse had gone to the stash house to inspect the methamphetamine. Cruz reassured Jesse that he was still available as a methamphetamine source if the Mexican source fell through.

While Jesse was preparing to receive 50 pounds of methamphetamine, 91 pounds arrived at the Wisconsin stash house. Escobar and Noyola met the load driver at a nearby gas station and brought the methamphetamine back to the Wisconsin stash house. Shortly thereafter, Rojas-Andrade arrived in Wisconsin and packaged the drugs. After delivering 2 of the 91 pounds to another customer, Rojas-Andrade, Escobar, and Noyola went back to the Wisconsin stash house. On their way, Martinez spoke to Jesse and told him that they had 50 pounds of methamphetamine for him.

After speaking to Martinez, Jesse drove in his Kia to the Wisconsin stash house and picked up a suitcase with 50 pounds of methamphetamine inside. After leaving the house, state troopers stopped Jesse's vehicle. Fifty pounds of methamphetamine were recovered from the trunk.

In anticipation of Jesse traveling to Wisconsin to retrieve the methamphetamine, law enforcement established a perimeter at the Wisconsin stash house and obtained an anticipatory search warrant. After hearing that Jesse had been stopped and that 50 pounds of methamphetamine were recovered, law enforcement saw Escobar and Noyola leaving the area and stopped them. Officers then executed the search warrant. During the search of the Wisconsin stash house, approximately 29 pounds of methamphetamine was recovered from a dining room freezer. One firearm was recovered from Escobar's bedroom, and the other firearm was recovered from Noyola's bedroom. The firearm recovered from Escobar's bedroom was between the mattress and box spring and was loaded. Weeks prior, Rojas-Andrade had given Noyola a gun for protection.

Law enforcement subsequently executed additional search warrants, including at the Case Avenue residence. At that residence, law enforcement seized five more pounds of methamphetamine from a duffel bag on the garage floor. Because the Mexican source of supply had been out of drugs for some time, the five pounds of methamphetamine seized from the Case Avenue residence was supplied by Cruz.

Jackson remained a fugitive until October 26, 2015, when he was located at a residence in West St. Paul, Minnesota. Following a high-speed chase, law enforcement arrested Jackson. The rental vehicle Jackson was driving was towed to an impound lot. Shortly after Jackson's arrest, he placed a phone call from jail to his parents. In that call, he indicated that "all [his] stuff [was] in the trunk" of the vehicle. Appellee's Br. at 22 (quoting Appellee's App. at A-131 (Ex. 111)). Deputy U.S. Marshals returned to the impound lot after listening to the phone call and searched the vehicle. They seized 445.8 grams of methamphetamine (440.45 grams of actual methamphetamine) from under the carpet inside the vehicle's trunk.

## B. *Procedural History*
### 1. *Indictment and Trial*

On September 22, 2015, an indictment was filed charging 11 individuals—including Escobar, Rojas-Andrade, Jackson, and Garcia—with a single count of conspiring to distribute methamphetamine from as early as December 2014 to on or about August 19, 2015 ("Count 1"). On October 14, 2015, a superseding indictment was filed adding two more people to the conspiracy, including Cruz. On June 13, 2016, an information was filed, charging Garcia with possessing with intent to distribute methamphetamine. On June 15, 2016, a second superseding indictment was filed continuing to charge the defendants who had not pleaded guilty, including Escobar, Jackson, and Cruz, with conspiring to distribute methamphetamine and adding two additional counts. Relevant to the present case, Count 3 charged Jackson with possessing methamphetamine with intent to distribute at the time of his arrest on October 26, 2015.

Jackson, Escobar, and Cruz proceeded to trial. Prior to trial, Jackson moved to suppress evidence obtained from the last wiretap, TT4. He argued that the wiretap affidavit failed to establish the requisite necessity, noting that some investigative techniques used during the investigation were successful. The district court denied the motion.

Escobar also moved to suppress the evidence seized as a result of the anticipatory search warrant for the Wisconsin stash house, arguing that the warrant lacked probable cause. Specifically, he argued that there was no probable cause for the triggering condition of the warrant. The district court denied the motion, finding that probable cause existed or, in the alternative, that the good-faith exception applied.

Three weeks prior to trial, Jackson moved to sever Counts 1 and 3, arguing that joinder was not proper and that failure to sever the counts would severely prejudice him. The district court denied the motion. At the trial's conclusion, the court instructed the jury to separately consider each count.

Also prior to trial, the government provided notice to Jackson that it intended to seek admission of his prior drug convictions as evidence under Federal Rule of Evidence 404(b). Specifically, it sought to introduce a 2008 federal conviction for conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine and a 2009 Minnesota conviction for possession of more than six grams (in total 19 grams) of methamphetamine. Jackson objected. The district court ruled that the convictions were admissible for the limited purpose of showing motive, intent, and knowledge. During trial, before the introduction of the convictions, the court gave the jury a limiting instruction, explaining that the prior convictions could only be used to prove knowledge and intent. In its closing, the government also cautioned the jury about the limited use of the prior convictions.

The jury was provided a special verdict form as to each defendant. If it found a defendant guilty of the conspiracy charge, it had three options to determine the quantity of methamphetamine involved in the conspiracy as to each defendant: (1) less than 50 grams; (2) 60 grams or more, but less than 500 grams; or (3) 500 grams or more. Cruz did not object to submission of these three options to the jury.

At the close of the government's case, Jackson and Cruz moved for a judgment of acquittal. *See* Fed. R. Crim. P. 29. Jackson generally asserted that the government failed to meet its burden of proof. Cruz, on the other hand, argued that insufficient evidence existed that he joined the conspiracy. He also argued that he never actually provided any quantities of methamphetamine to Jesse. The court denied the motions.

The jury convicted each defendant on all counts charged. It further found each defendant responsible for 500 grams or more of methamphetamine.

## 2. *Sentencing*
### a. *Cruz's Sentencing*

At Cruz's sentencing, he objected to the presentence report's (PSR) calculation of his base offense level. He objected to the inclusion of the methamphetamine seized at the Case Avenue residence and the 50 pounds of methamphetamine seized from Jesse in the drug quantity amount. The court overruled the objection, resulting in a Guidelines range of 292 to 365 months' imprisonment. The court considered the 18 U.S.C. § 3553(a) factors and varied downward. It sentenced Cruz to 250 months' imprisonment—42 months below the low end of the Guidelines range.

### b. *Jackson's Sentencing*

Jackson's PSR classified him a career offender as a result of his prior drug convictions, but because the adjusted offense level was higher than the career offender guidelines, the PSR used the Guidelines otherwise applicable. The parties agreed with the PSR that the Guidelines range was 360 months to life imprisonment. Jackson requested a downward variance due to his role in the conspiracy, his age, the fact he did not use a firearm, and the need to avoid disparities with similarly situated codefendants. The district court granted Jackson's request for the variance based on the § 3553(a) factors and sentenced Jackson to 330 months' imprisonment—30 months below the low end of the Guidelines range.

-12-

### c. *Escobar's Sentencing*

Prior to his sentencing, Escobar objected to the PSR's recommended two-level enhancement for possessing a firearm in connection with drug-trafficking pursuant to U.S.S.G. § 2D1.1(b)(1). In support of the enhancement, the government relied on evidence adduced at trial and offered a partial transcript of Escobar's post-arrest interview. During that interview, Escobar admitted knowing Rojas-Andrade had guns at the Wisconsin stash house. The district court overruled the objection. It calculated a guidelines range of 360 months to life imprisonment. It then varied downward, sentencing Escobar to 260 months' imprisonment.

### d. *Rojas-Andrade's Sentencing*

Rojas-Andrade indicated that he wanted to withdraw his guilty plea five months after the trial of his codefendants and after the final PSR was submitted to the district court. Rojas-Andrade's counsel explained that Rojas-Andrade was dissatisfied with certain concessions made in the plea agreement as to the applicable Guidelines enhancements. The district court denied the motion and proceeded to sentencing.

Rojas-Andrade's PSR recommended a two-level enhancement for his role in the offense, an enhancement for firearms, and an enhancement for maintaining a stash house. Rojas-Andrade objected. The district court overruled Rojas-Andrade's objections. The court then calculated a Guidelines range of 360 months to life imprisonment. After hearing the arguments of counsel and considering the § 3553(a) factors, the district court varied downward and sentenced Rojas-Andrade to 300 months' imprisonment—60 months below the Guidelines range.

### e. *Garcia's Sentencing*

Garcia pleaded guilty to the information charging him with possession to distribute methamphetamine stemming from his June 16, 2015 arrest. The PSR calculated a base offense level of 28 because Garcia possessed with intent to distribute 36.58 grams of actual methamphetamine. Garcia did not object to this paragraph of

the PSR. The court sentenced Garcia to 137 months' imprisonment, the top of the Guidelines range.

## II. *Discussion*

On appeal, the appellants raise a variety of issues related to their convictions and sentences. We consider each in turn.

## A. *Escobar*

Escobar appeals the denial of his motion to suppress evidence obtained through the search of the Wisconsin stash house. Authorities used an anticipatory search warrant to gain entry. We review legal issues de novo and factual findings for clear error. *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008). The warrant required the following condition: a coconspirator, Jesse, would travel to the house within a specified date range to pick up 50 pounds of methamphetamine and officers would stop the car after Jesse left the house and find the drugs. Investigators learned of Jesse's plans from a wiretap, but the affidavit supporting the warrant application did not disclose the wiretap as a source. Escobar posits that because the affidavit does not disclose the information source, it does not establish probable cause that the triggering condition would occur, as required under *United States v. Grubbs*, 547 U.S. 90, 96–97 (2006). Even if there was no probable cause, we conclude the good-faith exception applies because under the totality of the circumstances, officers' reliance on the warrant was objectively reasonable. *See United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007) ("When assessing the objective reasonableness of police officers executing a warrant, we must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." (cleaned up)). Therefore, we affirm the denial of Escobar's motion to suppress.

Escobar also appeals the application of a two-level sentencing enhancement for possession of a dangerous weapon in connection with a drug offense under U.S.S.G. § 2D1.1(b)(1). We review for clear error. *United States v. Payne*, 81 F.3d 759, 762

(8th Cir. 1996). The government must prove by a preponderance of the evidence that there was "a temporal and spatial nexus among the weapon, defendant, and drug-trafficking activity." *United States v. Torres*, 409 F.3d 1000, 1003 (8th Cir. 2005). Officers found the gun between the box spring and the mattress in Escobar's bedroom in the Wisconsin stash house. It was not clear error for the district court to find this constructive possession proved temporal and spatial nexus. *See id.* Therefore, we affirm the enhancement.

## B. *Rojas-Andrade*

Rojas-Andrade appeals the district court's refusal to allow him to withdraw his guilty plea prior to sentencing. "[W]e review the district court's decision to deny a motion to withdraw a plea for abuse of discretion." *United States v. Maxwell*, 498 F.3d 799, 801 (8th Cir. 2007). A defendant may withdraw a guilty plea before sentencing if he or she "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). Rojas-Andrade requested withdrawal because he disagreed with the recommended sentencing enhancements in the PSR. A defendant's "misunderstand[ing of] how the sentencing guidelines will apply to his case" is not a "fair and just reason" to withdraw a guilty plea. *United States v. Ramirez-Hernandez*, 449 F.3d 824, 826 (8th Cir. 2006). Therefore, we affirm denial of his motion to do so.

Rojas-Andrade also argues that his "300[-]month sentence is inherently unreasonable despite the advisory guideline range." Rojas-Andrade's Br. at 8. We review this sentence for an abuse of discretion, first ensuring that the district court committed no significant procedural error. *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (defining procedural error). In the absence of procedural error we consider a sentence's substantive reasonableness, taking into account the totality of the circumstances. *Id.* We may presume a within-Guidelines sentence is reasonable. *Id.*

-15-

Rojas-Andrade acknowledges that his sentence "constituted a downward variance from the guideline range." Rojas-Andrade's Br. at 9. But he argues that the district court "started from an unreasonable starting point and arrived at an equally unreasonably final number." *Id.* Rojas-Andrade argues the district court erred by considering evidence admitted during the trials of his coconspirators. Relying on these facts was not error, however, because the court may consider relevant information at sentencing as long as it "has sufficient indicia of reliability to support its probable accuracy." *United States v. Woods*, 596 F.3d 445, 448 (8th Cir. 2010) (quoting U.S.S.G. § 6A1.3(a)). He maintains that the district court "made erroneous findings of fact by adopting the factual basis of the PSR, placing him near the top of the conspiracy," Rojas-Andrade's Br. at 9, but he fails to identify which factual findings were erroneous. Nor did Rojas-Andrade object to the facts in the PSR. "We rely on and accept as true the unobjected to facts in the PSR." *United States v. Betts*, 509 F.3d 441, 444 (8th Cir. 2007) (citing Fed. R. Crim. P. 32(i)(3)(A); *United States v. Wintermute*, 443 F.3d 993, 1005 (8th Cir. 2006)). Furthermore, "[a] sentencing judge who also presided over the trial, as in this case, may base his factual findings on the trial record and is not required to hold an evidentiary hearing prior to sentencing." *United States v. Maggard*, 156 F.3d 843, 848 (8th Cir. 1998) (citing *United States v. Wiggins*, 104 F.3d 174, 178 (8th Cir. 1997)). Rojas-Andrade also argues the district court did not properly weigh the § 3553 factors and the sentence is substantively unreasonable. After reviewing the record, we conclude that the district court did not err in weighing the statutory factors and that the below-Guidelines sentence is substantively reasonable.

## C. *Jackson*

First, Jackson appeals the denial of his motion to suppress wiretap evidence. We review legal issues de novo and factual findings for clear error. *United States v. Milliner*, 765 F.3d 836, 839 (8th Cir. 2014) (per curiam). "Before granting an application for a wiretap, a judge must first determine that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to

succeed if tried or to be too dangerous.'" *United States v. Thompson*, 690 F.3d 977, 986 (8th Cir. 2012) (quoting 18 U.S.C. § 2518(3)(c)). Jackson argues traditional investigative techniques were successful and therefore the wiretap was not necessary. But the wiretap affidavit explains that despite some success with traditional techniques, investigators were "unable to identify all of the members of the [drug trafficking operation], the methods which the organization uses to transport drugs to Minnesota and elsewhere, where and how the drugs are stored, the organization's drug source of supply and all of their drug customers." Appellee's App. at A-43. The wiretap affidavit "establish[ed] that conventional investigatory techniques [were not] successful in exposing *the full extent* of the conspiracy." *Milliner*, 765 F.3d at 839 (emphasis added). We, therefore, affirm the denial of the motion to suppress.

Second, Jackson appeals the denial of his motion to sever Counts 1 (conspiracy to distribute methamphetamine) and 3 (possession of methamphetamine with intent to distribute). The court may order separate trials of counts if joinder would prejudice a party. Fed. R. Crim. P. 14(a). We review for abuse of discretion and will not reverse unless the denial of a motion to sever resulted in "severe prejudice" to the defendant. *United States v. Geddes*, 844 F.3d 983, 988 (8th Cir. 2017) (quoting *United States v. Steele*, 550 F.3d 693, 702 (8th Cir. 2008)). Severe prejudice requires a showing that the denial deprived the defendant of "an appreciable chance for an acquittal." *Id.* (quoting *United States v. Scott*, 732 F.3d 910, 916 (8th Cir. 2013)). There was no severe prejudice here. Overwhelming evidence supported conviction on Count 1, not even considering the events underlying Count 3. And evidence supporting Count 1 "would be properly admissible in a separate trial for [Count 3]." *Id.* (quoting *United States v. Erickson*, 610 F.3d 1049, 1055 (8th Cir. 2010)); *see also United States v. Robinson*, 639 F.3d 489, 494 (8th Cir. 2011) (explaining that prior drug distribution convictions are relevant under Rule 404(b) to demonstrate intent to distribute). Thus, it was not an abuse of discretion to deny the motion to sever.

Third, Jackson appeals the admission of his 2008 federal conviction for conspiracy to distribute 50 grams or more of methamphetamine and his 2009 state conviction for second-degree possession of six grams or more of methamphetamine. We review the admission evidence under Federal Rule of Evidence 404(b) for abuse of discretion. *United States v. Walker*, 428 F.3d 1165, 1169 (8th Cir. 2005). Evidence of a prior crime may be admissible under Rule 404(b) if it is "1) relevant to a material issue; 2) proven by a preponderance of the evidence; 3) of greater probative value than prejudicial effect; and 4) similar in kind and close in time to a charged offense." *Id.* Jackson claims the district court abused its discretion in admitting evidence of his prior drug convictions under Rule 404(b) because (1) they were too remote in time; and (2) his possession conviction was not similar in kind to the drug trafficking charges in this case.

Jackson claims the convictions were too remote in time. "To determine if a crime is too remote in time to be admissible under Rule 404(b), we apply a reasonableness standard, evaluating the facts and circumstances of each case." *United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006). "[T]here is no fixed period within which the prior acts must have occurred." *United States v. Baker*, 82 F.3d 273, 276 (8th Cir. 1996). But "[w]e have generally been reluctant to uphold the introduction of evidence relating to acts or crimes which occurred more than thirteen years prior to the conduct challenged. Nevertheless, our reluctance does not constitute a definitive rule." *United States v. Halk*, 634 F.3d 482, 487 (8th Cir. 2011) (citation omitted). "The *Halk* decision, however, recognizes that the 13-year rule does not apply where the defendant spent part of that time in prison." *United States v. Aldridge*, 664 F.3d 705, 714 (8th Cir. 2011) (citing *Halk*, 634 F.3d at 488–89 (allowing evidence of a 19-year-old conviction where the defendant spent more than 12 of those years in prison); *United States v. Williams*, 308 F.3d 833, 837 (8th Cir. 2002) (allowing evidence of a 20–year–old conviction where the defendant spent 16 of those years in prison); *Walker*, 470 F.3d at 1275 (allowing evidence of an 18-year-old conviction where the defendant spent 10 of those years in prison)).

-18-

Jackson's convictions are not too remote in time. The convictions are well within the 13-year period. Further, Jackson received 80 months' imprisonment for his federal conviction during that time, reducing the time gap between the prior offenses and the present conduct.

Jackson also argues his 2009 drug possession conviction was inadmissible under Rule 404(b) in a case involving the distribution of drugs. But "[i]t is settled in this circuit that 'a prior conviction for distributing drugs, and even the possession of user-quantities of a controlled substance, are relevant under Rule 404(b) to show knowledge and intent to commit a current charge of conspiracy to distribute drugs.'" *United States v. Robinson*, 639 F.3d 489, 494 (8th Cir. 2011) (quoting *United States v. Frazier*, 280 F.3d 835, 847 (8th Cir. 2002)). Thus it was not an abuse of discretion to admit Jackson's prior convictions.

Fourth, Jackson argues the evidence was insufficient to support his convictions for Count 1 (conspiracy to distribute methamphetamine) and Count 3 (possession of methamphetamine with intent to distribute). We review de novo, viewing "the trial evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences draw from the evidence that support the jury's verdict." *United States v. Johnson*, 519 F.3d 816, 821 (8th Cir. 2008) (quoting *United States v. Zimmermann*, 509 F.3d 920, 925 (8th Cir. 2007)). Jackson argues his conviction under Count 1 should be vacated because there was insufficient evidence that he and Jesse had reached an agreement to distribute methamphetamine. *See United States v. Espino*, 317 F.3d 788, 792 (8th Cir. 2003) ("To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy."). Jackson is wrong. The recorded conversation between Jackson and Jesse revealed more than just Jackson's acknowledgment of a debt to Jesse. Jackson also told Jesse he would meet with Jesse

to get drugs. The discussion topics included frequency of their meetings, Jackson's previous source, and the need for safety. The jury could conclude—and did conclude—that the communication involved an agreement to meet and exchange cash for drugs. In another conversation, Jesse told Jackson that he needed money for the 50 pounds of methamphetamine. Jackson replied, "I got you." Appellee's App. at A-110 (Ex. 71). The two men subsequently met, and Jackson handed Garcia $16,020 in cash. The jury could reasonably infer that Jackson gave money to Jesse as part of the agreement in the conspiracy to distribute drugs.

Jackson also claims that his conviction under Count 3 should be vacated because there was insufficient evidence that he knew the methamphetamine was in the vehicle. *See United States v. Thompson*, 686 F.3d 575, 583 (8th Cir. 2012) ("To sustain a conviction for possession with intent to distribute under 21 U.S.C. § 841, the jury must find beyond a reasonable doubt that [the defendant] (1) knowingly possessed a controlled substance and (2) intended to distribute some or all of it."). According to Jackson, "it was not unreasonable for [him] to be unaware that drugs were carefully hidden in the trunk of a car he did not own." Jackson's Br. at 46. He relies on *United States v. Pace*, 922 F.2d 451 (8th Cir. 2009).

In *Pace*, at the time of the stop, the defendant was the driver of a car that was transporting almost 200 pounds of cocaine divided among three duffle bags and a suitcase. 922 F.3d at 452–53. The defendant had either been driving the car or sleeping in the front passenger seat of the vehicle during the entire day and a half of the trip. *Id.* at 453. The drug-filled bags and suitcase were on the floor in the back seat or in the vehicle's cargo area. A codefendant testified that he did not tell the defendant what was in the luggage. *Id.* The government argued "that the street value of these drugs (estimated at between twelve and fifteen million dollars) meant that they would not be casually entrusted to an uninformed outsider" and "the extended amount of time [the defendant] spent in the car meant that he had to have discovered what was in the luggage." *Id.* The jury convicted the defendant, but we reversed, holding the

-20-

evidence insufficient to show beyond a reasonable doubt "that [the defendant] knew that he was helping carry cocaine across the country." *Id.* We concluded the evidence was insufficient because "it [was] merely conjecture to conclude [the defendant] knew what those packages contained." *Id.* There was "no evidence that [the defendant] ever explored the cargo area of the station wagon, much less that he examined or opened [the codefendant's] luggage that was stored there." *Id.*

*Pace* is distinguishable. Jackson's own statements led law enforcement to believe that they had missed something during their initial search. Jackson told his mother that police had impounded the rental car and that "all [his] stuff [was] in the trunk" of the vehicle. Appellee's Br. at 22 (quoting Appellee's App. at A-131 (Ex. 111)). Thus, unlike the defendant in *Pace*, Jackson acknowledged that everything in the trunk belonged to him. Jackson then stated, "I think they thought they were going to find something in the trunk, but they didn't. You know what I mean?" *Id.* A reasonable jury, knowing that police had already searched the trunk in Jackson's presence and found no contraband, could conclude that "they" referred to the police. Further, the jury could reasonably conclude that the "something" the police thought they would find would be something of interest to the police, such as contraband. After reviewing the record, we conclude there was sufficient evidence on Count 3.

Finally, Jackson argues his 330-month sentence is substantively unreasonable because the court did not give proper weight to mitigating factors. We review for abuse of discretion. *Feemster*, 572 F.3d at 461 (standard of review). Jackson presented the mitigating factors to the district court and received a below Guidelines sentence. We conclude there was no abuse of discretion and the sentence is substantively reasonable.

### D. *Garcia*

Garcia notes that he pleaded guilty to an information alleging a single count of possession with intent to distribute methamphetamine. He did not plead guilty to a

conspiracy charge. Consequently, according to Garcia, U.S.S.G. § 2D1.1. required the district court to exclude the portion of the methamphetamine intended for his personal use in calculating his base offense level. Garcia argues that the court knew of his drug addiction. The court knew, from the change-of-plea hearing, that he acquired methamphetamine for distribution but it also knew that he may have obtained some for himself.

Prior to sentencing, the PSR provided that Garcia was accountable for 36.58 grams of methamphetamine (actual). At sentencing, Garcia, proceeding pro se, challenged the *purity* of the drugs—not what portion of the methamphetamine was intended for his personal use, as opposed to distribution. The government then called the chemist who tested the drugs to testify. Following the chemist's testimony, the district court inquired whether the government or Garcia had "[a]nything further before the Court makes findings with respect to the Presentence Report." Sentencing Hr'g Tr. at 19, *United States v. Garcia*, No. 0:15-cr-00260 (D. Minn. Jan. 13, 2017), ECF No. 908. After the government responded that it had nothing else, the court then specifically asked Garcia if he had "anything else," and Garcia responded, "No I do not, sir." *Id.* The court then ruled, "[T]he Court does adopt the findings of Exhibit Number 1 from the BCA lab by a preponderance of the evidence and believes that that is the *weight and purity that is involved*." *Id.* (emphasis added). Thereafter, the court asked whether Garcia had "any further objections other than that previously indicated." *Id.* at 20. Garcia replied, "Other than that, then I believe that's—you know, that was the big issue . . . . [A]s far as objections to the PSR, no, I don't believe I have any other objections." *Id.* at 21. Thus, the court "adopt[ed] the findings as [it had] just indicated." *Id.*

Our review of the record shows that Garcia objected only to drug purity—not what portion of the 36.58 grams of methamphetamine was for his personal use. And, when specifically asked if he had any further objections to the PSR, Garcia indicated that he did not. Because Garcia lodged no objection to the drug-quantity calculation,

-22-

our review is for plain error. *See United States v. Hanshaw*, 686 F.3d 613, 617 (8th Cir. 2012) (per curiam) (holding appellate review is plain error when pro se defendant fails to raise objection to the district court). The district court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A).Garcia did not object to the drug quantity listed in the PSR, both prior to and at sentencing. By admitting to the drug quantity, Garcia cannot now on appeal assert that the district court erred by accepting an admitted fact. The district court did not err—plain or otherwise—in calculating that the 36.58 grams of methamphetamine was intended for distribution.

## E. *Cruz*

Cruz first argues the district court erred in admitting recorded out-of-court statements of coconspirators as non-hearsay under Federal Rule of Evidence 801(d)(2)(E). Specifically, Cruz challenges the admission of statements that Jesse made on a recorded phone call with Cruz.

We review interpretation of the rules of evidence de novo and admission of evidence for abuse of discretion. *United States v. Cazares*, 521 F.3d 991, 998 (8th Cir. 2008).

A statement is not hearsay if it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).

> It is well-established that an out-of-court declaration of a coconspirator is admissible against a defendant if the government demonstrates (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy.

*United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir. 1978). We have held

> that an out-of-court statement is not hearsay and is admissible if on the independent evidence the district court is satisfied that it is more likely than not that the statement was made during the course and in furtherance of an illegal association to which the declarant and the defendant were parties.

*Id.* at 1044. A preponderance-of-the-evidence standard is sufficient proof of a conspiracy for purposes of admitting a coconspirator's statement. *Id.*

Here, Jesse's statements provide context for Cruz's responses and demonstrate the existence of an agreement. Thus, admission of these statements was proper because they are not "assertions" offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(a), (c)(2) (defining hearsay). Cruz also challenges the admission of Jesse's recorded statement to the Mexican supplier that Jesse was working "ten at a time" with another supplier, presumed to refer to ten pounds of drugs Cruz sold to Jesse. Even if this statement was inadmissible hearsay, its admission was harmless because Jesse made a nearly identical statement to a distributor who was one of Cruz's coconspirators. *See United States v. Whitehead*, 238 F.3d 949, 952 (8th Cir. 2001). We affirm the district court's evidentiary rulings.

Second, Cruz argues there was insufficient evidence of drug quantity to support his conviction for conspiracy to distribute more than 500 grams of a mixture containing methamphetamine pursuant to 21 U.S.C. § 841(a)(1), (b)(1)(A). *See Johnson*, 519 F.3d at 821 (standard of review). The jury heard circumstantial evidence that Cruz sold at least a couple pounds of methamphetamine to Jesse before Jesse traveled to Duluth. After reviewing the trial record, we conclude a reasonable jury could conclude based on this evidence that Cruz conspired to distribute more than 500 grams of a mixture containing methamphetamine. We affirm the conviction.

Third, Cruz argues the district court erred in its drug-quantity calculation under the Guidelines because it attributed to Cruz 50 pounds of methamphetamine recovered from Jesse's car. Cruz asserts that he "played no role in the acquisition, distribution, or storage of these drugs"; therefore, "these controlled substances do not constitute 'relevant conduct' under USSG § 1B1.3." Cruz's Br. at 22. He contends that because of this error, the district court increased his Guidelines range from 121 to 151 months' imprisonment to 292 to 365 months' imprisonment. We review the drug-quantity calculation for clear error. *United States v. Plancarte-Vazquez*, 450 F.3d 848, 852 (8th Cir. 2006).

Cruz's PSR found that Cruz was responsible for the 50 pounds of methamphetamine seized from Jesse's vehicle on August 19, 2015, as well as the 5 pounds of methamphetamine seized from the Case Avenue residence. This resulted in a base offense level of 38 and a Guidelines range of 292 to 365 months' imprisonment. At sentencing, Cruz objected to the inclusion of both quantities of drugs. The district court overruled Cruz's objection based upon the trial evidence and its review of the PSR.

> In the case of a jointly undertaken criminal activity, relevant conduct includes all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity and that occurred during the commission of the offense of conviction. When determining whether acts of co-conspirators qualify as relevant conduct under the guidelines, we look to the scope of the *individual defendant's* undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole.

*United States v. Gaye*, 902 F.3d 780, 789–90 (8th Cir. 2018) (cleaned up).

> For purposes of calculating drug quantity in a drug conspiracy case, the district court may consider amounts from drug transactions in which the

defendant was not directly involved if those dealings were part of the same course of conduct or scheme. This includes all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy.

*United States v. King*, 898 F.3d 797, 809 (8th Cir. 2018) (cleaned up).

We conclude that the district court did not clearly err in finding that the 50 pounds of methamphetamine seized from Jesse's car were attributable to Cruz. Cruz belonged to the conspiracy to distribute drugs to the Minnesota/Wisconsin area. The conspiracy consisted of at least two sources of methamphetamine, of which Cruz was one source. After the Mexican source contacted Jesse about receiving 50 pounds of methamphetamine, Jesse contacted Cruz to inform him of its imminent arrival. Thereafter, Cruz called Jesse to find out whether Jesse had gone to the stash house to inspect the methamphetamine. Cruz reassured Jesse that he was still available as a methamphetamine source if the Mexican source fell through. This evidence shows that Cruz was aware of the drug transaction, which was part of the conspiracy to distribute drugs in the Minnesota/Wisconsin area.

### III. *Conclusion*
We affirm the judgment of the district court in all respects.

_____